### GULF REFINING CO. v. FOX.
No. 3315.

District Court, S. D. West Virginia.
July 11, 1935.

Fred O. Blue, Arthur S. Dayton, and Blue, Dayton & Campbell, all of Charleston, W. Va., for plaintiff.

Homer A. Holt, Atty. Gen., and Ira J. Partlow, Asst. Atty. Gen., for defendant.

Before SOPER, Circuit Judge, and McCLINTIC and CHESNUT, District Judges.

SOPER, Circuit Judge.

The question in this case is whether 568 gasoline filling stations in West Virginia are so related to the Gulf Refining Company, the plaintiff, as to require it to pay the license fees imposed by the West Virginia Chain Store Act. (chapter 36, W. Va. Acts 1933), upon every person who operates or maintains one or more stores within the state under the same general management. The suit was brought against the state tax commissioner, to whom the license fees claimed by the state had been paid by the plaintiff under protest, in order to secure a decree enjoining him from paying the money into the state treasury, and the grounds stated for this relief were: (1) That gasoline filling stations are not "stores" within the meaning of the act; (2) that, if interpreted to include such stations, the act violates the due process and equal protection clauses of the Fourteenth Amendment of the Federal Constitution; and (3) that, if the act is constitutional and embraces filling stations, it does not require the plaintiff to pay the tax demanded, since the stations in question have not been under its general management or control, but have been independently operated.

We agreed with the plaintiff in the first two contentions, for the reasons given in the opinion of this court in Standard Oil Co. v. Fox, 6 F. Supp. 494, a companion case, and consequently we did not find it necessary to decide the third issue raised. Appeals were taken in both cases to the Supreme Court of the United States, and, pending the hearing thereof, it was stipulated that the decision of the Supreme Court in the Standard Case should govern the appeal in this case on all questions except the third. The Supreme Court reversed the decision in the Standard Case in Fox v. Standard Oil Co., 294 U. S. 87, 55 S. Ct. 333, 79 L. Ed. 780, holding that gasoline filling stations are stores within the meaning of the West Virginia Chain Store Act, and that the rates imposed by the act were not so oppressive as to amount to arbitrary discrimination or unlawful confiscation, even though they should exceed the net profits attributable to the operation of the stations. It was decided, in view of the positive advantages enjoyed by the owner, and the possible disadvantages suffered by the public from chain store operation, that the state had power to impose a chain store tax regulated only by the number of units in the chain, without regard to the amount of business done or profits earned. The judgment in the pending case was also reversed, Fox v. Gulf Refining Co., 295 U. S. 75, 55 S. Ct. 641, 79 L. Ed. 1311, and the case was remanded to this court to consider and decide the undetermined question.

At the outset, we must take into account the sweeping terms of the law which clearly manifest the intention to cover all situations in which several stores or mercantile establishments are subjected to a common control. Section 1 of the act provides that it shall be unlawful for any person "to operate, maintain, open or establish any store" in the state without first having obtained a license from the state tax commissioner; section 5 provides that every person "opening, establishing, operating, maintaining one or more stores or mercantile establishments within this state under the same general management, supervision or ownership" shall pay certain license fees for the privilege, which range in amount from $2 upon one store to $250 for each store in excess of 75. Sections 7 and 8 of the act are as follows:

"Sec. 7. The provisions of this act shall be construed to apply to every person, firm, corporation, copartnership or association, either domestic or foreign, which is controlled or held with others

by majority stock ownership or ultimately controlled or directed by one management or association of ultimate management.

"Sec. 8. The term 'store' as used in this act shall be construed to mean and include any store or stores or any mercantile establishment or establishments which are owned, operated, maintained and/or controlled by the same person, firm, corporation, copartnership or association, either domestic or foreign, in which goods, wares or merchandise of any kind, are sold, either at retail or wholesale."

The case, at this stage of the litigation, is submitted to us upon the record and briefs filed in the Supreme Court, and, from the undisputed facts therein contained, we summarize the circumstances which create the relationship between the plaintiff and the chain of stores at which its products have been sold. The plaintiff owns or controls 20 warehouses or bulk plants in the state, from which it distributes wholesale stocks of petroleum products, and also 15 filling stations at which its products are sold at retail. In addition, there are 176 filling stations at which Gulf products have been sold at retail, under "Authorized Dealer Agency Agreements," commonly spoken of as "A. D. As." The plaintiff admits that all of the above plants and filling stations are taxable to it under the act. The controversy relates to 568 additional stations operated by "Authorized Licensed Dealers," and referred to in the record as "A. L. Ds"; and the question is whether the relationship between the plaintiff and these dealers is such as to require the conclusion that these stations also are owned, operated, maintained, or controlled by it.

The arrangement is evidenced by (1) a lease of the premises from the "Authorized License Dealer" to the Gulf Company; (2) a license from the Gulf Company to the dealer for retail sale of Gulf products on the premises; (3) a contract for the sale of Gulf products by the Gulf Company to the dealer; and (4) various receipts for equipment and forms of riders sometimes used. Ordinarily, the premises are owned or leased by the dealer. The lease from him to the plaintiff is for the term of a year, with the right of renewal on its part for an additional period of years. The rental is usually fixed at 1 cent per gallon of motor fuel sold on the premises; and this rental is paid by deducting the amount from the cost price of the gasoline delivered to the dealer. The dealer agrees to pay state and county taxes assessed against the premises and to keep the premises in good condition; and the plaintiff agrees to pay all license fees imposed upon the sale of petroleum products thereon. But the latter obligation is assumed by the dealer in the license granted to him to sell Gulf products on the premises.

The plaintiff has the right at any time to install such additional fixtures and equipment as it may deem necessary for the conduct of its business, and may, at any time during the term of the lease, remove the equipment placed by it on the premises. The plaintiff is given the option of purchasing the premises at any time prior to the expiration of the lease. It is stipulated that "one of the purposes of such lease is to fix a definite period and a definite right in the plaintiff (the Gulf Company) in respect of the leased premises and the location of equipment to be loaned by the plaintiff to the authorized license dealer."

A nonexclusive, revocable, and nonassignable license to sell the Gulf products upon the leased premises is granted to the dealer. The licensee agrees to make every reasonable effort to promote the sale of the Gulf products and to purchase and keep on hand at all times a sufficient quantity thereof to supply the demand. He agrees to purchase his entire requirements from the Gulf Company and promises not to sell any other products, under the Gulf trade-names or through its equipment. He is permitted to represent himself as an authorized dealer of Gulf products, but may not represent himself as an employee or agent of the company. The Gulf Company reserves the right to revoke the license at any time upon twenty-four hours' notice, and, in case of such revocation, to repurchase at the price paid therefor any Gulf products in the possession of the licensee.

The Gulf Company and the dealer enter into a contract for the sale of Gulf products which recites that the Gulf Company "controls by lease or owns the premises above referred to," and provides for the sale of certain quantities of Gulf products per annum, to be delivered upon the leased premises and paid for at the Gulf

Company's posted service station prices on the day of delivery, less usually an allowance of 2½ cents per gallon for gasoline, and less deductions on oils and greases, usually 40 per cent., and less the allowance for gallonage rental, plus, however, the federal tax. The state gallonage tax is added to the posted retail price. A great majority of the dealers pay cash upon delivery, but a few pay for such products from load to load, and a few upon credit terms of four weeks. The dealer agrees to pay all taxes, license fees, or other charges that may be assessed against the property and equipment; to keep the same in good order and repair; to be responsible for damages thereto; and to save harmless the Gulf Company from any claim for damages to person or property incident to his use and occupation of the premises, and resulting from the installation and use of the equipment located thereon.

If the license for the sale of Gulf products is revoked as hereinbefore referred to, then the contract for the sale and purchase of the Gulf products immediately terminates, and no liability for damages attaches to either party on account of the termination. If the dealer uses any part of the premises or equipment for the storage, sale, or delivery of other than Gulf products, the right to use the premises and equipment immediately ceases, and the Gulf Company has the right to cancel the contract immediately, and, upon such termination, the dealer agrees to deliver the premises and the equipment to the Gulf Company. Upon the request of the dealer, a rider to the contract is executed by the Gulf Company, whereby the dealer is permitted to use a portion of the premises for the sale of other merchandise, but under such rider the dealer is not permitted to sell the products of any competitor of the Gulf Company.

The equipment used on the premises for the retail sales, including tanks, pumps, advertising signs, etc., is owned by the Gulf Company, and is kept painted and repaired by it without charge to the dealer.

The dealer sells the products upon such credit terms as he determines. The Gulf Company issues so-called courtesy cards which entitle the holders to purchase Gulf products on credit, and these cards are honored at the service stations operated by the Gulf Company throughout the several states which it serves. The Gulf Company, upon the request of an A. L. D., permits him to honor these courtesy cards, and in all such cases the Gulf Company collects from the holder of the cards and accepts the charge tickets from the dealer at their face value.

The prices at which the dealer sells the Gulf products are usually the prices which are posted by the plaintiff singly or with other distributors of gasoline. The prices fluctuate from time to time, and information of these fluctuations is given by the plaintiff to the dealers, and the tank truck drivers may change the figures in the metal disks which are attached to the pumps furnished to the dealers. If a dealer does not conform to the posted prices, the plaintiff, through its agents, negotiates with him to the end that he may be brought into line with the posted prices in the immediate territory. Such result may be accomplished by terminating the sales and license agreements. These contracts have been canceled by mutual consent from time to time, but thus far the plaintiff has not exercised its right to cancel any license contract in the State of West Virginia.

The dealer selects, pays, and discharges his assistants and employees, and makes minor repairs or alterations to the premises, without the knowledge or consent of the Gulf Company.

The Gulf Company has no access to the records of retail sales made by the dealer; nor is it given information in respect thereto.

As part of the sales policy of the Gulf Company, its salesmen and truck drivers are trained to extend the sale of its products, and to observe the operation of the A. L. D. stations with regard to any practice which may detract from the sales, and they may suggest to the dealer the change of his practices or the adoption of practices which may be helpful to increase the sales. The Gulf Company has expended large sums of money in several states, including West Virginia, advertising its products, and in establishing its good will with the motoring public.

Prior to the latter part of 1931, all leasing arrangements for the sale of the Gulf Company's products were made under the A. D. A. or lease and agency agreements. In the latter part of that

year and in the early part of 1932, a number of these stations were changed to the A. L. D. arrangement. Since this change of policy was inaugurated, no new A. D. A. agreements have been made.

The plaintiff urges that certain features of this arrangement are sufficient to show that the company not only lacks such control over the individual stations as is contemplated in the act, but fails to enjoy those advantages of an integrated chain store system upon which the reasonableness of chain store taxes are usually based. It is pointed out that each dealer purchases his own supply of petroleum products independently of all others; that he becomes the owner of the goods so purchased and resells them as other merchants in the ordinary course of business; that he extends such credit as he sees fit to his customers, and stands the losses incident thereto; that he enjoys the gains and suffers the losses upon the stock on hand, resulting from price fluctuations; that he employs and discharges his own employees, keeps his books and records without interference from the Gulf Company, and generally conducts the business of his station in such manner as he desires. Hence it is said that there are lacking in the situation the advantages of chain store organization which have been noted in the decisions of the Supreme Court in State Board of Tax Commissioners v. Jackson, 283 U. S. 527, 51 S. Ct. 540, 75 L. Ed. 1248, 73 A. L. R. 1464, and Fox v. Standard Oil Co., 294 U. S. 87, 55 S. Ct. 333, 79 L. Ed. 780, such as the advantages of abundant capital, the power and skill to buy merchandise in suitable quantities and varieties, central warehousing, standard and efficient merchandising methods, a general sales policy, and advertising on a national scale.

We are unable to follow this line of argument, for it seems to us that all of these benefits flow from the practical operation of the plan which the plaintiff company has adopted. It may be conceded that it does not exercise full control over all of the actions of the dealers in a strict legal sense, but its actual control is so effective that little room is left for independent action on their part, while full enjoyment of the advantages inherent in a chain store system on its part is ensured. Adequate control over the operating methods of the dealers and of the retail prices of the goods is secured by the right retained by the company to cancel the license agreement and to put an end to the business relations between the parties; and at the same time to retain possession of the dealer's premises under the lease. It is of little moment to the company whether the legal title to the goods resides in it or passes upon delivery to the dealer: 511 dealers pay cash on delivery; 32 pay from load to load; and only the remaining 15 are given a credit of four weeks. The method of storage and sale of the merchandise is largely determined by the kind of equipment which is furnished by the company to all dealers alike; and variations in local methods of conducting the business are constantly subject to the supervision and suggestions of the agents of the company. That part of the premises used as a filling station is reserved for the sale of Gulf products only. We are forced to conclude that the goods are acquired in large quantities by the company and sold at the stations at substantially the same prices and in substantially the same way as if the stations were actually owned by the company and the dealers were its exclusive agents in the strict legal sense. A similar conclusion in regard to a like situation was reached by the Supreme Court of Indiana in Midwestern Petroleum Corporation v. State Board of Tax Commissioners, 206 Ind. 688, 187 N. E. 882, 889, 191 N. E. 153, cited by the Supreme Court in Fox v. Standard Oil Co., 294 U. S. 87, 96, 55 S. Ct. 333, 79 L. Ed. 780, in the course of its discussion with respect to filling stations as stores within the meaning of the Chain Store Act.

The plaintiff further contends that in a true legal sense the stations are not owned, operated, maintained, or controlled by it within the meaning of the act. It is recognized that the plaintiff has a sort of control over the filling stations, but the rule is invoked that a taxing statute in case of doubt is to be construed most strongly against the government and is not to be extended by implication beyond the clear import of the language used. Gould v. Gould, 245 U. S. 151, 38 S. Ct. 53, 62 L. Ed. 211. Hence it is said that the term "controlled" does not cover the relationship between the plaintiff and the authorized license dealers in this case, for it must be construed

to refer to a legally enforceable control, and not merely to the ability to influence the dealer through the power to terminate his contract.

In support of this argument, it is noted that section 7 of the act expressly provides that it shall be construed to apply to every person or corporation "which is controlled or held with others by majority stock ownership or ultimately controlled or directed by one management," and it is urged that this language necessarily implies a legal control, and that therefore the same meaning must be given to the next succeeding section 8, which defines the term "store" as used in the act, to include any store or stores "which are owned, operated, maintained and/or controlled by the same person, firm [or] corporation." It is suggested that the decisions of the Supreme Court of West Virginia, in interpreting the word "control" in other state statutes, should be followed here; and reference is made to the decision in Coal & Coke Ry. Co. v. Conley, 67 W. Va. 129, 67 S. E. 613, which construed an act relating to railroad passenger fares, providing that nothing therein should apply to any railroad under fifty miles in length and not a part of or under the control, management, or operation of any other railroad, over fifty miles in length. It was held that the words "under the control of" had the same meaning in the act as "a part of."

Reference is also made to the decisions of the federal courts in interpreting the provisions of sections 240 (b) of the Revenue Act of 1918 (40 Stat. 1081, 1082), and section 240 (c) of the Revenue Act of 1921 (42 Stat. 260), whereby it was enacted that two or more domestic corporations shall be deemed affiliated, inter alia, if one corporation owns directly or controls substantially all of the stock of the others. It has been held that the control required in this connection is legally enforceable control. Handy & Harman v. Burnet, 284 U. S. 136, 52 S. Ct. 51, 76 L. Ed. 207; Atlantic City Electric Co. v. Commissioner, 288 U. S. 152, 53 S. Ct. 383, 77 L. Ed. 667; Commissioner v. Atlantic City Electric Co. (C. C. A.) 57 F.(2d) 186.

The contentions so persuasively stated do not, however, lead us to the conclusions pressed upon us. Section 7 of the act in its requirement of control by a majority stock ownership does not refer to the relationship between the chain store owner and the individual store under his management; but to the relationship of a holding company or a parent company to its subsidiaries; and the sort of control that would be appropriate in one of these situations would not necessarily be suitable in the other. Section 7 bears some analogy to the provisions of the Revenue Acts regarding the affiliation of corporations as affecting the tax on corporate incomes; but it is manifest that the determination by the courts that a particular sort of control was meant by the lawmaking body in dealing with one set of circumstances does not require that the same conclusion be reached when a different legislative purpose is to be accomplished. We should rather apply the rule of interpretation laid down by the Supreme Court of West Virginia in Coal & Coke Ry. Co. v. Conley, supra, and in Robinson v. Kistler, 62 W. Va. 489, 59 S. E. 505, wherein it is declared that the word "control" has no legal or technical meaning, and must be given such an interpretation as the Legislature intended it to have, to be ascertained from the connection in which it is used, the act in which it is found, and the legislation of which it forms a part. The West Virginia Chain Store Act was passed under the stress of urgent financial necessity, as we had occasion to point out in Standard Oil Co. v. Fox, 6 F. Supp. 494; and the Legislature, consistently with its obvious purpose to cover all chain store organizations, did not confine the incidence of the tax to stores under a common ownership, but was careful to provide that the law should apply to all stores owned, operated, maintained, or controlled by the same person. The wide range of the tax from $2 to $250 per store, according to the number of stores in the chain, indicated an intention to impose a heavy tax upon large aggregations, and this important purpose would be easily frustrated if a narrow interpretation should be placed upon the phraseology indicating a common management or control.

We think that the terms of the act apply to the facts of the case at bar, and that it is reasonable to say that the Gulf Company, within the meaning of the statute, operates as well as controls the A. L. D. stations as parts of an integrated

chain store organization. This view is supported in our opinion by the concession which the plaintiff has felt compelled to make with regard to its taxability for the 176 A. D. A. stations which it also operates. The similarity between the A. D. A. and the A. L. D. arrangements, from a practical standpoint, is striking. The principal features of the A. D. A. agency consist of a lease of the premises by the dealer to the Gulf Company, and the appointment of the dealer as a commission agent of the company under an arrangement whereby he is paid a commission upon the sales made, and undertakes to keep records, to make reports to the company, and to assume responsibility for expenses and damages. The principal difference between this arrangement and the A. L. D. relationship is with regard to the title of the goods. In the A. D. A. case, the title remains in the plaintiff until the goods are sold by the operator. In the A. L. D. case, the title passes at once upon delivery to the dealer. This difference, however, is of little practical importance. The A. D. A. dealer makes daily remittances for goods sold, while the A. L. D. dealer in nearly all cases pays cash on delivery. It is true that the latter enjoys the profit, if there is a rise in price, and suffers the loss in case of a reduction. But the average storage capacity of the stations is small, and the net gain or loss over a substantial period of time is insignificant. In short, considering the business of the plaintiff as a whole and the substantial similarity with which both of the arrangements described enable the plaintiff to carry out its general purposes, it does no violence to the statute to treat the operator in both cases as in substance the agent of the plaintiff company.

It should be pointed out that the arrangements between the plaintiff and the station operators we have discussed were not devised for the purpose of avoiding liability for the West Virginia chain store tax, for they were set up before the passage of the act. The purpose may have been to enable the plaintiff to avoid liability for the torts of numerous operators so widely scattered that supervision over the details of their conduct is well-nigh impossible. Questions of this sort were considered by the courts in Gulf Refining Co. v. Rogers (Tex. Civ. App.) 57 S.W.(2d) 183, and Greene v. Spinning (Mo. App.) 48 S.W.(2d) 51, and it was held, under agreements expressly conferring a stricter control over the operation of the stations than appears on the face of the papers in the pending case, that the operators were employees or agents of the oil companies rather than independent contractors, and liability of the companies for the torts of the operators was established. Compare Greaser v. Appaline Oil Co., 109 W. Va. 396, 155 S. E. 170, in which it was held that the owner and driver of trucks, which delivered gasoline from the tanks of the oil company to its customers, was an independent contractor for whose torts the company had no responsibility. We are not called upon to decide the question of tort liability under the agreements in this case, for it is in no way involved, and it does not necessarily follow that the plaintiff is liable for the torts of the dealers merely because it has such a control over the stations as to subject it to the chain store tax.

The bill of complaint will be dismissed.