## STANDARD OIL CO. OF TEXAS v. STATE.

### No. 2100.

Court of Civil Appeals of Texas. Eastland.

June 14, 1940.

Rehearing Denied July 19, 1940.

L. L. Moore and Frank J. Kockrits, Jr., both of San Francisco, Cal., and Burges, Burges & Scott, of El Paso, for appellant.

Gerald C. Mann, Atty. Gen., and Glenn R. Lewis, Billy Goldberg, and Cecil C. Rotsch, Asst. Attys. Gen., for appellee.

GRISSOM, Justice.

The State of Texas filed this suit against the Standard Oil Company of Texas for the purpose of collecting "chain store taxes" on twenty gasoline "filling" stations. (For convenience, plaintiff will hereafter be referred to as State, or plaintiff, and defendant as Standard, or defendant.) The cause was tried to the court upon an agreed statement of facts, under Art. 2177, R.S.1925. The court held defendant liable for said taxes and entered judgment therefor. Defendant has appealed.

At defendant's request, the court filed its conclusions of law, which are in part as follows:

"(1) All of the twenty filling stations in question are stores within the meaning of the Texas Chain Store Tax Act (Acts 1935, 44th Legislature, First C.S., p. 1589, ch. 400 [Vernon's Ann.P.C. art. 1111d]). They all come within the definition set out in Section 7 of the Act, which reads as follows:

"(2) 'The term "store" as used in this Act shall be construed to mean and include any store or stores or any mercantile establishment or establishments not specifically exempted within this Act which are owned, operated, maintained, or controlled by the same person, agent, receiver, trustee, firm, corporation, copartnership or association, either domestic or foreign, in which goods, wares or merchandise of any kind are sold, at retail or wholesale.'

"(3) The Act provides for certain exemptions; but none of the twenty filling stations in question come within any of the exemptions, and none of them are exempt from the license fee and taxes provided for in the Act. Section 5 of the Act provides that 'any place of business engaged exclusively in the storing, selling, or distributing of petroleum products and servicing of motor vehicles' is not included in the terms of the Act. This is really an exemption, which permits two things, (1) 'storing, selling or distributing' of a certain kind, and (2) 'servicing.' The only selling included in this exemption is the selling of petroleum products; and therefore when any article of merchandise such as tires, batteries, or anything else that is not a petroleum product, is sold by a place of business, that sale is more than is al-

lowed by this exemption, and consequently the place of business does not come within the exemption. This exemption uses the word 'exclusively', which means 'solely' or 'only', and therefore, in order for a place of business to be within the terms of the exemption the only 'selling' it can carry on is the selling of petroleum products. The fact that the article sold is put on a motor vehicle at the time of the selling does not alter the case, because it is still a sale and selling is still going on. If an article other than a petroleum product is sold, even though it is put on an automobile at the time, the seller is not engaged 'exclusively' in the sale of petroleum products, and consequently is outside of the exemption. As the facts show that merchandise, other than petroleum products, including tires, batteries, and automobile accessories, and other articles, were sold at each of the twenty filling stations in question, all of the stations are therefore stores subject to the terms of the Act, and are not within the terms of the exemption, regardless of the fact that said merchandise was placed ·on the motor vehicle at the time of the sale in the case of some of the stations.

"(4) The first eight filling stations described in the plaintiff's petition, and referred to in the evidence as Group A and Group B, during all of the times involved in this suit, were each owned, operated, maintained and controlled by the defendant, Standard Oil Company of Texas. Each of said eight stations and all of their equipment were owned by the defendant, and the defendant's agents were in charge and control of each of said stations.

"(5) The remaining twelve filling stations described in the plaintiff's petition, and referred to in the evidence as Group C, Group D, Group E and Group F, during all of the times involved in this suit, were operated and maintained under the same general management and controlled by the same person and corporation, to-wit, Standard Oil Company of Texas, the defendant herein, by virtue of the contract, referred to as a 'distributor's agreement' between the Standard Oil Company and each of the persons in physical charge of said twelve filling stations, and also by virtue of the acts in evidence by which the Standard Oil Company of Texas actually exercised control and management over each of said twelve stations."

The applicable provisions of the Texas Chain Store Tax Statute, Art. 1111d, Ver-

non's Ann.P.C. (Acts 1935, 44th Leg., First C.S., p. 1589, ch. 400), are as follows:

"Sec. 5. Every person, agent, receiver, trustee, firm, corporation, association or copartnership opening, establishing, operating or maintaining one or more stores or mercantile establishments within this State, under the same general management, or ownership, shall pay the license fees hereinafter prescribed for the privilege of opening, establishing, operating or maintaining such stores or mercantile establishments. * * * Provided that the terms, 'store, stores, mercantile establishment or mercantile establishments' wherever used in this act shall not include: wholesale and/or retail lumber and building material businesses engaged exclusively in the sale of lumber and building material; and/or oil and gas well supplies and equipment dealers; or any place of business engaged exclusively in the storing, selling, or distributing of petroleum products and servicing of motor vehicles; or any business now paying an occupation tax measured by gross receipts; or any place or places of business used as bona fide wholesale or retail distributing points by manufacturing concerns for distribution of products of their own manufacture only; or any place or places of business used by bona fide processors of dairy products for the exclusive sale at retail of such products. * * *

"Sec. 6. The provisions of this Act shall be construed to apply to every person, agent, receiver, trustee, firm, corporation, copartnership or association, either domestic or foreign, which is controlled or held with others by majority stock ownership or ultimately controlled or directed by one management or association of ultimate management.

"Sec. 7. The term 'store' as used in this Act shall be construed to mean and include any store or stores or any mercantile establishment or establishments not specifically exempted within this Act which are owned, operated, maintained, or controlled by the same person, agent, receiver, trustee, firm, corporation, copartnership or. association, either domestic or foreign, in which goods, wares or merchandise of any kind are sold, at retail or wholesale."

The twenty filling stations in question were referred to upon the trial and are referred to in the briefs, in groups substantially as follows:

Group A consists of six stations, admittedly owned and operated by Standard,

through its agent Standard Stations, Inc. (Both of said organizations are corporations.) These stations sell petroleum products. They also sell automobile tires, tubes, batteries, spark plugs, light globes and anti-freeze liquid, etc. Such accessories are installed on the customers' automobiles at the time of sale.

Group B consists of two stations owned and operated by Standard, through said Standard Stations, Inc. They sell the same products as is sold by Group A. However, the agents in charge of said stations, in two instances, sold accessories without installing them on their customers' automobiles, contrary to defendant's instructions.

Group C consists of three stations which sell petroleum products and automobiles accessories. These stations are not operated by Standard Stations, Inc., as are Groups A and B, but are operated by persons designated as "Distributors." Automobile accessories are sold by these stations and some of the articles sold are not installed upon automobiles, but are carried away by the customers. Standard owns, or leases from a third person, these stations and the land on which they are located. Standard and the Distributors have entered into a contract called "Distributor's Agreement" under which, among other things, the distributor agrees to sell only Standard's petroleum products and only Standard's tires, tubes and batteries.

Group D consists of two stations. The facts with reference to said Group are the same as in Group C, except in addition to the selling of petroleum products and automobile accessories, they also sell merchandise not connected with an automobile, such as gloves, bath mats, etc.

Group E consists of five stations. The facts relative to this Group are the same as in Group C, except the station and the land on which it is located is owned, or leased from a third person, by the Distributor, instead of Standard. Otherwise, the "Distributor's Agreement" is the same as in Group C.

Group F consists of two stations. The facts relative to this Group are the same as in Group E, except in addition to petroleum products and automobile accessories sold by the stations in Group E this group sells merchandise not connected with an automobile.

We understand Standard's contention to be that the exception, or exemption, from payment of the tax, found in section 5, Art. 1111d, Vernon's Ann.P.C., authorizes it to sell something in addition to petroleum products; that is, that it may sell anything necessary to the servicing of a motor vehicle if it installs the article sold at the station where petroleum products are also sold, stored or distributed. In other words, Standard contends that the sale and installation of automobile accessories at the filling stations is permitted by the last phrase of the exemption clause, to-wit, "servicing of motor vehicles."

The trial court construed this exemption to permit two things: (1) "selling" of only one certain kind of product, to-wit, petroleum products, and (2) "servicing" of a limited kind, that is, of motor vehicles. The trial court concluded that the selling permitted by the exemption was that of petroleum products only, and that when merchandise other than petroleum products is sold such sale is without the limits of the exemption. It concluded that the sale and installation of tires, tubes, batteries and other accessories at the station did not make such transaction a service only, but that such transaction constituted a sale, and a sale of something other than petroleum products, and, therefore, was without the limits of the exemption.

We think the twenty filling stations are stores within the foregoing statutory definition. They are certainly mercantile establishments at which goods, wares and merchandise are sold. (We shall hereafter consider whether or not they are controlled by defendant.) The real question is whether or not these stations come within the exemption of section 5, reading: "Provided that the terms, 'store, stores, mercantile establishment or mercantile establishments' wherever used in this act shall not include: * * * any place of business engaged exclusively in the storing, selling, or distributing of petroleum products and servicing of motor vehicles * *."

The Supreme Court of Texas, in passing upon the constitutionality of Art. 1111d, Vernon's Ann. P.C., in Hurt v. Cooper, 130 Tex. 433, 447, 110 S.W.2d 896, 904, in an opinion by Judge Hickman, said: "The statute having defined the word, we are not concerned with its usual meaning. Under that definition a mercantile establishment at which goods, wares, or mer-

chandise of any kind, except those exempted, are sold is a store and is taxable as such * * *."

The Supreme Court of the United States in Fox v. Standard Oil Company of New Jersey, 294 U.S. 87, 95, 55 S.Ct. 333, 336, 79 L.Ed. 780, in construing the definition of "store" in the West Virginia chain store tax law (which definition is essentially the same as that in section 7 of Art. 1111d, Vernon's Ann. P.C., supra) said: "There is no doubt that goods, wares and merchandise of a kind, i. e., gasoline and other petroleum products, and even tires and other automobile accessories, are sold by the complainant and its agencies at its plants and service stations. This satisfies the test of the statute, and subjects the seller to the tax."

In Midwestern Pet. Corp. v. State Board of Tax Commissioners, 206 Ind. 688, 187 N.E. 882, 191 N.E. 153, the Supreme Court of Indiana, construing its statute in which "store" is defined essentially the same as it is in the Texas statute, held that filling stations were stores.

Each of the stations in question in this case sold merchandise other than petroleum products. Therefore, the stations were not engaged "exclusively in the * * * selling * * * of petroleum products and servicing of motor vehicles." We need give no citation of authority nor discuss a statement that exemptions are strictly construed against a person claiming the exemption. We are of the opinion that when the legislature used the language in the exemption clause "engaged exclusively in * * * selling * * * petroleum products" the word "exclusively" was used synonymously with "only" and "purely." Benevolent & P. O. E. Lodge v. City of Houston, Tex.Civ.App., 44 S.W.2d 488, 493; Little Theatre of Dallas v. City of Dallas, Tex.Civ.App., 124 S.W.2d 863, 865; Red v. Johnson, 53 Tex. 284, 289; Santa Rosa Infirmary v. City of San Antonio, Tex.Com.App., 259 S.W. 926, 931.

In 23 C.J. 275 "exclusively" is defined as "To the exclusion of all others; without admission of others to participation; in a manner to exclude."

Standard contends that "exclusively" means "principally." We think the term as used and intended by the legislature means "only", or "to the exclusion of all others." Such interpretation comports with the action of the Senate in the enactment of this law in rejecting a prior provision in the exemption clause which would have exempted persons engaged "principally" in the business of selling, storing and distributing petroleum products, and in substituting the word "exclusively" for the word "principally." If the selling permitted is "exclusively" petroleum, or "only" petroleum, or "to the exclusion of all others", than petroleum products, then certainly the legislature did not intend to permit (by using the words "and servicing of motor vehicles") the sale of a type of merchandise denied and excluded by the language used in the first part of the same sentence. Under Standard's construction of the exemption clause it would be permitted to sell, in addition to petroleum products, all of the automobile accessories and other merchandise customarily sold at Automobile Parts Stores and Tire Stores and yet not suffer the tax liabilities of such stores, simply by virtue of the fact that such accessories were placed on the customers' automobiles at a place where petroleum products were sold, distributed or stored.

In Hurt v. Cooper, 130 Tex. 433, 446, 110 S.W.2d 896, 904, the Court said:

"The fact that the merchants not taxed, or those exempted from the tax, sell a different kind of goods from those which are taxed, is an all-sufficient justification of the classification or exemption. * * *

"The contentions with reference to most of the so-called exemptions may be disposed of by the mere statement that the kinds of goods sold by the exempted stores are different from those sold by the taxed stores. This is true of lumber yards, oil and gas well supply houses, service stations, and places used by bona fide processors of dairy products. The exemption of oil and gas well supply dealers is expressed in broad terms. Literally it seems to state that the exemption is not alone to businesses dealing in certain commodities, but is one personal to the dealers. *However, it is reasonably susceptible of the construction that it covers only the oil and gas well supply business, and that persons engaged in that business are not exempted when engaged in other taxed businesses. It is our duty to give it that construction in passing upon its validity.*" (Italics ours.)

Certainly, if the exemption in section 5, immediately preceding the exemption in question, to-wit, "and/or oil and gas well

supplies and equipment dealers" should be construed, as the Supreme Court says it should be, and persons engaged in such business bring themselves, or their businesses, outside the exemption "when engaged in other taxed businesses"; under the exemption now in question a place of business engaged in selling automobile accessories is not engaged "exclusively in the * * * selling * * * of petroleum products" and brings itself outside the exemption when it engages in selling products distinct and different from petroleum products. Since a basis, or justification for such a classification, or exemption, is the fact that the business exempted "sell[s] a different kind of goods from those which are taxed" we should avoid, if possible, a construction of such exemption that would cause an automobile tire and accessory business to be exempt when conducted in connection with the selling, storing or distributing of petroleum products, but subject to the tax if the connection with petroleum is lacking. If Standard's interpretation is adopted then the Tire and Automobile Accessory chain stores may bring themselves within the exemption with very little addition to, or change of, their present systems.

█ It is a cardinal rule of statutory construction that every part of a statute should be given effect and that a construction should be avoided that will render any part of an act inoperative, nugatory or superfluous. 39 Tex.Jur. 208. This rule of statutory construction would be violated should we adopt Standard's construction of the statute to the effect that "servicing of motor vehicles" includes selling of "not only petroleum products but * * * gadgets of various kinds. * * * and all of those things necessary to the use of automobiles." If Standard's construction of the exemption provision is correct, the legislature did a needless thing, and its language was superfluous, in the first part of the exemption clause wherein it permitted the sale of petroleum products, because under Standard's construction of "servicing" it includes the selling of petroleum products and all other things necessary to the use of automobiles. Such construction makes the phrase "servicing of motor vehicles" include the prior phrase "selling * * * of petroleum products", thus making the phrase "selling * * * of petroleum products" superfluous, contrary to the established and recognized rules of construction of the statutes.

If the language exempting only those engaged exclusively in selling petroleum products is given effect, a place that sells only petroleum products remains within the exemption and a place of business that engages in the selling of something more than petroleum products steps outside the exemption. The inclusion of the phrase "servicing of motor vehicles" in the exemption may well be explained by fear that the inhibiting language that precedes it might be construed so as to prohibit such a place of business from rendering the service (as distinguished from sale) usually rendered at such a place of business, such as the furnishing of air and water and washing and greasing of automobiles. Citizens' Nat. Bank of Hillsboro v. Graham, 117 Tex. 357, 4 S.W.2d 541; Lufkin v. City of Galveston, 63 Tex. 437; Spence v. Fenchler, 107 Tex. 443, 180 S.W. 597; Henderson v. United States F. & G. Co., Tex.Com.App., 10 S.W.2d 534; Dobie v. Scott, Tex.Civ.App., 188 S.W. 286; Roedenbeck Farms, Inc. v. Broussard, Tex. Civ.App., 124 S.W.2d 929, 935.

The defendant says that service stations are exempt from chain store taxes and gives three reasons why it contends they are and should be exempt. First, service stations are inherently different from chain stores and are, therefore, not properly a part of anti-chain store legislation. As heretofore pointed out, the Supreme Court in Hurt v. Cooper, supra, in passing upon the constitutionality of the chain store tax statute, gave as a basis, or justification, of the exemption of certain businesses from such taxes, and the taxation of others, that those exempted "sell a different kind of goods from those which are taxed." Defendant's first reason, therefore, is not applicable to the stations in question because they sell the same kinds of merchandise which other businesses not exempt from the tax sell.

The second reason given is that such taxes "fall particularly, harshly upon gasoline dealers since they are already subject to numerous taxes." As "gasoline dealers" the stations in question are not subject to the tax. It is the fact that they are engaged in selling products other than petroleum that keeps them without the exemption and subjects them to the tax.

The third reason given by the defendant is: "Every State favors its home industries." We recognize the correctness of the statement. We recognize that the pe-

troleum business is one of the greatest businesses of the State of Texas and that the legislature, in the exemption heretofore discussed, intended to exempt from the chain store tax businesses engaged in selling, storing and distributing petroleum products. But, the automobile tire and accessory business is not a home industry.

As illustrative of the situation, the record shows that the gasoline used in these stations was produced and refined in Texas, whereas its tires, tubes and batteries and automobile accessories were obtained by Standard outside of Texas.

We shall next consider whether or not the stations are operated under the same general management, or are controlled by the Standard Oil Company of Texas. The eight filling stations included in Groups A and B are admittedly owned, operated and controlled by defendant through its agent, Standard Stations, Inc. We shall, therefore, confine our attention to the filling stations designated as Groups C to F, inclusive. Relative to Group C and D the control exercised by the defendant is identical. The Standard entered into a contract known as "Distributor's Agreement" with the stations in Groups C to F.

(A) Said contract calls for the sale by Standard to such distributors of the Standard's petroleum products. It provides for sale or consignment by Standard to said stations of its Atlas brand tires, tubes and batteries. The merchandise so sold by Standard to the distributors, the contract provides, is to be such as is currently sold at service stations operated by Standard Stations, Inc., in distributors' vicinity. The contract does not call for the sale of any specified commodities, but the merchandise to be handled by the distributors is dependent upon the will of Standard, in that, the distributors are to buy from Standard and sell, or are to receive on consignment from Standard and sell, merchandise which is currently sold by the defendant's agent, Standard Stations, Inc., in distributors' vicinity.

(B) The contract is for a period of years. It provides, however, that either party may terminate the agreement at the end of the first six months of any contract year, or at the end of said contract year, by giving the other party thirty days' notice. It is provided, however, with reference to the stations to which it is applicable, that the contract shall terminate immediately upon the termination of any

lease which the Standard has upon the premises used by the distributor. The stations in Group C and D are either owned or leased by Standard.

(C) Standard agrees to furnish to the distributor the authorized type of distributor's signs and to "supply such advertising signs and manuals as in the opinion of the company will assist distributor in the proper marketing of merchandise hereunder." Standard does not agree to supply any certain amount of advertising signs or any particular type, other than the authorized distributor's signs, but the advertising to be supplied the distributor depends upon Standard's opinion as to the type and amount of signs and manuals that will assist the distributor in the marketing of its merchandise.

(D) Standard agrees to use the same care in establishing other distributors as it uses in establishing admittedly company operated stations. In other words, the determination of the number of stations to be opened in the distributor's vicinity rests with Standard.

(E) Standard agrees to sell and the distributor to buy from Standard all of distributor's requirements of petroleum products. The distributor agrees to use only Standard's petroleum products, and he is prohibited from using the petroleum products of any other company. The contract provides for no certain petroleum products and the determination of what petroleum products are to be sold by the distributor is dependent upon the discretion of Standard, in that the contract calls for sale and delivery by Standard to the distributor of those products which are currently used by defendant's agent in distributor's vicinity. The distributor agrees that the products covered by the contract are to be sold to the public as Standard's products and under its trade marks and brands.

(F) The contract provides that the distributor's requirements shall be delivered by or upon the order of Standard to the distributor at the distributor's location.

(G) The price to be paid by the distributor to Standard for its petroleum products is to be Standard's posted price to its dealers in distributor's vicinity.

(H) Standard agrees to sell or consign, and the distributor to buy or receive as consignee, all of distributor's requirements of tires, tubes and batteries. The distribu-

tor is prohibited from selling any other line of tires, tubes and batteries. The agreement provides that the tires, tubes and batteries are to be the regular line of Atlas tires, tubes and batteries currently sold in defendant's stations in distributor's vicinity. In other words, the type of Atlas tires, tubes and batteries to be sold by the distributor rests within the discretion of the Standard because the distributor agrees to sell the same type as is sold by Standard through its own stations in that vicinity.

(I) Standard agrees to deliver to distributor such other Atlas merchandise as distributor wishes to handle in quantities necessary, in the opinion of Standard, to meet the distributor's trade requirements. It would appear that the amount of such accessories necessary to meet the distributor's requirements is to be determined by Standard.

(J) Whether the accessories are to be sold or consigned to distributor depends on Standard's current policy. But Standard agrees to allow distributor the commissions, or their equivalent, in differentials below Standard's authorized or suggested selling price as set forth in a schedule made a part of the contract. It is agreed the schedule may be modified from time to time by Standard. The purpose of this provision is to guarantee to the distributor a profit on the sale of accessories whether sold or consigned to him. The price list furnished by Standard on consigned goods gives the authorized price and on merchandise sold gives the suggested selling price. The schedule may be modified at the will of Standard. This provision concerning accessories appears to vest great discretion in Standard, in that its current policy is to be followed and the company is to prepare the price list, which it may modify at will.

(K) Distributor agrees to paint the stations, at distributor's expense, in a manner approved by Standard. This provision certainly gives Standard the right to control the physical appearance of distributor's station.

(L) Standard is given the right to arrange, replace, and remove signs, or other advertising matter, in such manner as, in Standard's opinion, will mutually benefit the parties. The type and amount of advertising to be used by distributor is dependent upon the will of Standard.

(M) Distributor agrees to diligently promote the sale of products and merchandise delivered under the distributor's agreement and to use his best efforts to increase the sales of Standard's products.

(N) The sales to distributor are for cash on delivery, unless Standard waives its right to cash payment. If distributor fails to make payments when due he breaches the contract and it may be canceled, at the option of Standard.

(O) The distributor's agreement provides that if taxes are imposed by any governmental authority upon or measured by the products or manufacture of the goods, which is the subject matter of the contract, or incidentally as a result of the transaction, and if such taxes are payable by Standard, such taxes shall be added to the price of the merchandise purchased by distributor from Standard.

(P) The contract provides that Standard is bound to supply petroleum products purchased by distributor, so long as its supply of crude oil is sufficient; otherwise it is not bound under the agreement. Distributor is bound to accept the merchandise delivered under the terms of the agreement.

(Q) Distributor agrees to conduct his business so as to preserve Standard's property, further sales of its products, and to promote good-will toward Standard and its products.

(R) Distributor agrees to maintain Workmen's Compensation Insurance. The contract provides that Standard may at any time request distributor to furnish it with evidence that the distributor is carrying Workmen's Compensation Insurance.

As stated by plaintiff, if Standard is not actually operating and controlling the distributor's station it is hard to understand why Standard should require that distributor carry such insurance. We think it may reasonably be deduced from such provision that Standard feared distributor's station would be held to be Standard's station, or the distributor the agent of Standard, and that Standard might be held liable for injuries to distributor's employees.

(S) The distributor's agreement provides that if distributor fails to perform any obligation imposed upon him under the contract, Standard may, at its option, terminate the contract. It is further provided that a waiver of one breach does not constitute a waiver of further

breaches of distributor's obligations under the contract.

We think it is true, as contended by the State, if the distributor failed to carry out his obligation to promote goodwill toward Standard and its products, and failed to promote sale of its products and sell certain of its products exclusively, and as much of its products as possible, the company might terminate the agreement at its option. We agree with the State that "This big stick which the company wields over the distributor * * gives said company practical control over the operation of the distributor's stations."

We ·will now briefly call attention to some of the facts disclosed by the agreed statement of facts, or stipulations, which, in our opinion, show, or tend to show, control of the stations by Standard.

(1) Every four to six weeks Standard's representative calls at said stations, inspects the equipment and other facilities and makes such suggestions as he sees fit to the distributor. Such representative after each visit and inspection makes a written report thereof to Standard. Such representative also makes an audit of the stock consigned. by Standard to the distributor. Standard furnishes the distributor with a merchandise manual and an accounting manual which contains suggestions as to the manner of conducting the station's business. Standard sends letters from time to time to the distributors giving them information and suggestions as to the operation of the business. Standard furnishes distributors with charts for their guidance. These charts contain information concerning credit cards which will be honored by Standard.

(2) Standard, at all times in question, advertised its products in the territories where they were sold by means of newspaper advertisements and by large billboard posters, and, in 1938 and 1939, advertised its products by radio.

(3) Standard owned the gasoline pumps, under ground tanks and advertising signs used by the distributors.

(4) All tires, tubes and batteries sold by distributors were guaranteed by Standard. The guarantee was issued by the distributor who sold the article, the distributor signing the guarantee for Standard. Purchasers could obtain adjustments due under Standard's guarantee at any of said stations.

■ Other matters indicating control of the distributors by Standard may be found in the "Distributor's Agreement" and the agreed statement of facts. We are of the opinion that a fair and careful analysis of the distributor's contract and the agreed statement of facts show that the distributors' stations are under the control of Standard within the meaning of the Chain Store Tax Statute. Gulf Ref. Co. v. Fox, D.C., 11 F.Supp. 425, 429; Ashland Ref. Co. v. Fox, D.C., 11 F.Supp. 431; Midwestern Pet. Corp. v. State Board of Tax Commissioners, 206 Ind. 688, 187 N.E. 882, 889, 191 N.E. 153; Maxwell v. Shell Eastern Pro. Inc., 4 Cir., 90 F.2d 39, 41; Belk Bros. Co. v. Maxwell, 215 N.C. 10, 200 S.E. 915, 122 A.L.R. 687; Bedford v. Gamble-Skogmo, Inc., 104 Colo. 424, 91 P.2d 475, 478. We quote from the opinion in the last cited case the following extracts which we consider in a large degree applicable to the facts of the instant case:

"We are compelled to believe that on the one side there is an intimacy of regulation and on the other a fullness of submission which imports ultimate control in the company. * * *

"Under chain store tax statutes similar in principle to the Colorado act, the courts have determined that 'control' in the strict legal sense is not a requisite to, this liability for the tax. * * *

"Each agency store, like a satellite traveling in its independent orbit, primarily is guided by the planetary influence of the company."

We are of the opinion that the trial court's conclusions of law are correct; that the stations involved are stores because they sell merchandise other than petroleum products; that the stations do not come within the exemption of Section 5 of Art. 1111d, Vernon's Ann. P. C., because they are not "engaged exclusively in the storing, selling, or distributing of petroleum products" and servicing of motor vehicles, in that they sell merchandise other than petroleum products, petroleum products being the only articles that may be sold by a business within the exemption. We are of the opinion that these stations are operated under the same general management and are controlled by the Standard Oil Company of

Texas. From all of which it results that defendant is liable for the Chain Store Taxes on the stations in question.

The judgment is affirmed.