Elroy M. SATTERLEE, Tax Assessor-Collector, Pasadena Independent School District, et al., Petitioners,

v.

GULF COAST WASTE DISPOSAL AUTHORITY et al., Respondents.

No. B–7400.

Supreme Court of Texas.

Nov. 1, 1978.

Rehearing Denied Dec. 29, 1978.

Baskin, Fakes & Stanton, Stanley D. Baskin, Pasadena, Joe Resweber, County Atty., Larry W. Hays and Paul Bibler, Jr., Asst. County Attys., Houston, for petitioners.

Fulbright & Jaworski, Rufus Wallingford, Baker & Botts, Frank G. Harmon, M. L. Skelton, Butler, Binion, Rice, Cook & Knapp, Donald B. McFall, Vinson, Elkins, Searls, Connally & Smith, Ben H. Rice, III, Andrews, Kurth, Campbell & Jones, Lawrence L. Bellatti, Houston, for respondents.

STEAKLEY, Justice.

This suit was instituted by Gulf Coast Waste Disposal Authority, a political subdivision of Texas,[1] against the taxing authorities of Harris County and of the Pasadena Independent School District. Its purpose was to obtain a judicial declaration that a tract of real property of approximately 35 acres located within the County and School District, together with all improvements thereon, is exempt from taxation. The property in question will be identified later. In the course of pleadings filed in the proceeding, the taxing authorities assumed the position of counter-claimants. As such they sought judgment for taxes legally due; the Authority and five private industries—Champion International Corporation, Atlantic Richfield Company, Air Products and Chemicals, Inc., Crown Central Petroleum Corporation, and Petro-Tex Chemical Corporation—were named as counter-defendants.

The trial court ruled that the property in question was exempt from taxation and decreed that the taxing authorities take nothing under their counter-claims. This judgment was affirmed by the Court of Civil Appeals. 561 S.W.2d 869.

The Authority acquired legal title to the property in a transaction represented by two written instruments: a Facilities Agreement dated August 24, 1972, and a subsequent limited conveyance termed a Special Warranty Deed dated June 4, 1973. The signatories to the Facilities Agreement were the Authority, Champion International Corporation, Air Products and Chemicals, Inc., Atlantic Richfield Company, Crown Central Petroleum Corporation and Petro-Tex Chemical Corporation. The Grantor in the subsequent conveyance was Champion International Corporation.

Article VIII, § 2(a) of the Texas Constitution provides that ". . . the legislature may, by general laws, exempt from taxation public property used for public purposes . . .."

The enabling statute, Article 7150, § 4,[2] provides that there shall be exempt from taxation "All property, whether real or per-

---

1. The Gulf Coast Waste Disposal Authority is a conservation and reclamation district. See Article XVI, § 59 of the Constitution and Tex. Laws 1969, ch. 409, p. 1336.

2. All references are to Tex.Rev.Civ.Stat.Ann.

sonal, *belonging exclusively* to this State, or any political subdivision thereof, . . ."[3]

The initial problem to be solved is whether these instruments, when viewed in their entirety, vested exclusive ownership of the property in the Authority as required for tax exemption. We hold that they did not.

It was stated in Recital 4 of the Facilities Agreement that "the Authority proposes to construct an integrated regional waste collection, treatment and disposal system sufficient to receive, treat and dispose of industrial waste from Participants' plants."

Recital 7 of the Agreement recognized the economic value flowing to the participating private industries: "The Authority has determined that it can collect, treat and dispose of the industrial waste of the Participants by the purchase and/or construction of an integrated collection, treatment and disposal system more economically than the Participants can furnish separately said services, . . . ." Prior to the transaction the signatory industries had been responsible for the disposition of their own industrial waste. It is also apparent that the construction of new facilities, together with the additions to existing facilities, were to be financed by publicly sponsored revenue bonds, an arrangement of obvious advantage to the participating industries.

Paragraphs 8.1–10.5 of the Agreement pertain to three facilities: The Primary Treatment Facility, The Secondary Treatment Facility and The Sludge Disposal Facility. As to these, the Agreement provided that Champion would deliver a deed in required form to the Authority after sufficient proceeds from certain specified bonds had been deposited. Although the record is unclear, it seems to be the case that Champion had previously constructed and was using the first two facilities located on the land in question, and that the third facility had been or would be constructed on the same tract.

The Facilities Agreement further defined in detail and at considerable length the contractual obligations of the parties, particularly the restrictions imposed on the Authority in the operation of the facilities. Illustrative are these provisions:

2.4 The Authority shall expand the Facilities to increase the capacity or to upgrade the treatment *at the request of all Participants or at the request of any Participant,* provided that any such Participant or Participants pay all costs of construction or purchase or agree to amortize the cost of any Bonds sold to pay for any such expansion and to pay any other additional costs occasioned by any such expansion, as determined by the Authority and approved by the Industrial Advisory Council. Participants shall have the prior right to all present and future capacity of the Facilities. *The Authority shall restrict the use of the land described in Exhibit E to the use of the Participants, unless otherwise agreed to by all Participants.*

2.5 *The Authority shall not transfer control or operation* of the Facilities to any other governmental agency or to any one of the Participants or to any third party *without written consent of the Participants.*

.    .    .    .    .

22.3 The Authority agrees to operate the Facilities which it is obligated to operate under the terms hereof with Authority supervisory personnel and to allow the Participants to provide such additional personnel as may be necessary to operate the Facilities during any Authority work stoppage.

22.4 *Any provision of this Agreement to the contrary notwithstanding, the Participants, or any of them, shall have the right to operate or cause to be operated the Facilities in the event the Authority cannot operate the Facilities because of force majeure or refuses to accept the Industrial Waste.* The Authority agrees to assist the Participants in the management, operation and maintenance of the Facilities during any period of force maj-

---

**3.** Italics are added in each instance.

eure should the Participants elect to operate the Facilities.

. . . . .

26.1 The Authority may enter into contracts with Other Corporations for the treatment of their wastes in the Facilities; *provided, however, that such contracts are approved by all Participants,* which approval shall not be unreasonably withheld.

Additional control is retained by the industry Participants through the Industrial Advisory Council, composed of one representative from each Participant. Each pipeline and treatment facility must have an operating manual prepared by the Authority and approved by the Industrial Advisory Council. Monthly operating reports on each facility must be submitted to the Council. All construction contracts must be approved in writing by the Council in accordance with plans and specifications prepared by the Authority's engineers and previously approved by the Council. The Council must approve any change orders in construction contracts. The expenditure of funds is tightly controlled. Monthly financial statements must be submitted to the Council and the records and books of the Authority must be open to audit by any Participant at any time.

Thereafter, under date of June 4, 1973, Champion, by Special Warranty Deed conveyed to the Authority 35.633 acres of land, together with the improvements thereon. This is the property in question. The conveyance contained these provisions as required by the Facilities Agreement:

Grantor, it[s] successors and assigns, excepts and reserves all of the oil, gas and other minerals in, under and that may be produced from the Subject Property; . . .

This conveyance is delivered and accepted subject to exceptions, limitations, covenants, reservations, restrictions and all matters recited in all deeds, leases, easements or other instruments listed, described or set forth in Exhibit A attached hereto and hereby made a part hereof.

*This Special Warranty Deed is delivered and accepted pursuant to, and subject to the terms and provisions of, that certain Facilities Agreement dated as of August 24, 1972,* by and between Gulf Coast Waste Disposal Authority, Air Products and Chemicals, Inc., Atlantic Richfield Company, Champion International Corporation, Crown Central Petroleum Corporation and Petro-Tex Chemical Corporation (hereinafter called "the Facilities Agreement").

TO HAVE AND TO HOLD all and singular the Subject Property, subject to the foregoing restrictions, exceptions and reservations, unto Grantee, its successors and assigns, *so long as the Subject Property is used as a facility for the treatment of "Industrial Waste"* (as said term is defined in said Article 7621d–2 on the date of execution hereof), *and upon cessation of such use, the Subject Property together with all improvements now or hereafter located thereon, shall automatically revert to Grantor,* its successors and assigns, without the necessity of re-entry or any other action on the part of Grantor, its successors and assigns; and Grantor does hereby bind itself, its successors and assigns to WARRANT and FOREVER DEFEND all and singular the Subject Property, subject to the foregoing restrictions, exceptions and reservations and subject to the foregoing special limitation, unto Grantee, its successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof by, through or under Grantor, but not otherwise. This conveyance is made with full substitution and subrogation of Grantee in and to all covenants and warranties by others heretofore given or made with respect to the Subject Property or any part thereof.

It is thus apparent on the face of the written instruments underlying the arrangement between the Authority and the participating industries that the legal title of the Authority in the property is strictly governed and encumbered by the Facilities Agreement for the use and benefit of these private industries and that the Authority

holds title only so long as it is used as a facility for the treatment of industrial waste.

In *Standard Oil Company of Texas v. State,* 142 S.W.2d 519 (Tex.Civ.App.1940, writ ref'd), the Court construed the words of the chain store tax exempting "any place of business engaged *exclusively* in the storing, selling or distributing of petroleum products and servicing of motor vehicles." The Court wrote that the word "exclusively" was used by the Legislature synonymously with "only" and "purely" and cited 23 C.J. 275 where the word exclusively was defined as "to the exclusion of all others; without admission of others to participate; in a manner to exclude." It was ruled that the term as used and intended by the Legislature meant "only" or "to the exclusion of all others." This Court refused the application for writ without qualification and thereby manifested approval of this construction of the statute. See *Hamilton v. Empire Gas and Fuel Co.,* 134 Tex. 377, 110 S.W.2d 561 (1937).

The Supreme Court of Wisconsin, in ruling the land there involved to be subject to taxation and not to exemption, wrote that "exclusive ownership" is necessarily ownership free from any kind of legal or equitable interest in any one else. *Comstock v. Boyle,* 144 Wis. 180, 128 N.W. 870 (1910). This same Court later wrote that taxation or exemption depends not upon the legal title but on the status of the owner of the beneficial interest in the property; and that the Court will always look to the substance and not to the form. *State v. Bareis,* 257 Wis. 497, 44 N.W.2d 259 (1950). See also *Mitchell Aero, Inc. v. City of Milwaukee,* 42 Wis.2d 656, 168 N.W.2d 183 (1969).

In speaking of land taxable to the owner of a beneficial interest who did not have legal title, the United States Supreme Court wrote in *Montana Catholic Missions v. Missoula County,* 200 U.S. 118, 26 S.Ct. 197, 50 L.Ed. 398 (1906):

. . . The expression "beneficial use" or "beneficial ownership or interest" in property is quite frequent in the law, and means, in this connection, such a right to

its enjoyment as exists where the legal title is in one person and the right to such beneficial use or interest is in another, and where such right is recognized by law, and can be enforced by the courts, at the suit of such owner or of some one in his behalf.

26 S.Ct. at 200.

The Washington Supreme Court has written that "beneficial interest" is profit, benefit or advantage resulting from contract or ownership of estate as distinct from legal ownership or control. *Christiansen v. Department of Social Security,* 15 Wash.2d 465, 131 P.2d 189 (1942).

In our view, the conclusion is inescapable that under the terms of the Special Warranty Deed from Champion to the Authority, and of the Facilities Agreement to which it was subject, the Authority acquired substantially less than exclusive ownership of the property in question.

The Authority argues to the contrary that even assuming that the provisions of the Facilities Agreement give rise to an equitable interest, this does not prevent the property from belonging exclusively to the Authority, citing *City of Beaumont v. Fertitta,* 415 S.W.2d 902 (Tex.1967). This was not the problem in *Fertitta* and the decision does not rule this case. The legal title of the City of Beaumont was not encumbered as is that of the Authority here under the Facilities Agreement, and no question was there raised or decided with respect to the exclusive ownership prerequisite to tax exemption. After *Fertitta,* we approved without qualification the opinion of the Court of Civil Appeals in *Maverick County Water Control & Improvement District # 1 v. State,* 456 S.W.2d 204 (Tex.Civ.App.1970, writ ref'd). There the Court recognized *Fertitta* but cited *State v. Bexar-Medina-Atascosa Counties Water Improvement District,* 310 S.W.2d 641 (Tex.Civ.App.1958, writ ref'd), also approved by this Court, where it was held that land did not belong exclusively to the State while the contract with the Veterans Land Board remained in effect. As to this, the Court in *Maverick* wrote that "While the contract was in ef-

fect, the land was 'owned by the Veteran,' 310 S.W.2d at 643, with the State holding only the legal title." The Court upheld the tax exemption in *Maverick* for the reason as stated in the opinion that the Veterans Land Board "held full legal and equitable title to the land." [4] We approved the principles of law declared in the opinion by unqualified refusal of writ of error.

Our conclusion that the Authority was not vested with the requisite exclusive ownership renders unnecessary a re-examination of the holding in *Fertitta* that Article 7150, § 4, provides for the exemption from taxation of municipal property regardless of the use to which it is put or the purposes for which it is held.

As previously indicated, the Authority by the institution of this suit sought judgment declaring that the property and all improvements thereon are exempt from taxation, with a direction to the taxing authorities to remove the property from their tax rolls. The counter-claim of the taxing authorities sought judgment against the counter-defendants for the total amount of taxes then due, together with penalties, interest, cost and other expenses legally due and owing. The courts below granted the declaratory relief sought by the Authority and did not reach the issues to be adjudicated in the counter-claim of the taxing authorities. The judgments below are therefore reversed and the cause is remanded to the trial court for further proceedings in accordance with this opinion.

POPE, J., concurs in the result.

GREENHILL, C. J., concurs.

GREENHILL, Chief Justice, concurring.

I am unable to reconcile a part of the court's opinion with the holding of this court in *City of Beaumont v. Fertitta,* 415 S.W.2d 902 (Tex.1967).

I agree with the court's judgment of this case because the property in question is strictly governed and encumbered by the Facility Agreement for the use and benefit of the private industries, and because I am of the opinion that this court's opinion and judgment in *Fertitta* was, and is, wrong. I joined two other justices in the dissent in that case.

The municipality's title to the land in *Fertitta* was subject to a long-term lease wholly for private use. As the dissent in *Fertitta* said, "The Court is now holding for the first time that the Legislature may exempt municipal property devoted to private use."

The better rule is stated by this court in *Leander Independent School District v. Cedar Park Water Supply Corp.,* 479 S.W.2d 908 (1972), where we said, "We accordingly now hold that the clause [of the Texas Constitution] in question authorizes the Legislature to exempt only publicly owned property used for public purposes."

## ON MOTION FOR REHEARING

STEAKLEY, Justice.

■ We ruled in the original opinion that as a matter of law the subject property was not exclusively owned by the Authority under the manner of its acquisition; and that for this reason the property was not exempt from taxation under Article VIII, Sec. 2(a) of the Constitution and the enabling statute, Article 7150, Sec. 4. The Authority in its Motion for Rehearing urges, in effect, that, nonetheless, the property is tax exempt under Article XI, Sec. 9 of the Constitution which provides:

The property of counties, cities and towns, owned and held only for public purposes, such as public buildings and the sites therefor, fire engines and the furniture thereof, and all property used, or intended for extinguishing fires, public grounds and all other property devoted exclusively to the use and benefit of the public shall be exempt from forced sale and from taxation, . . .

4. The Veteran failed to make the required payments and the Board had declared his rights under the contract forfeited.

It is to be noted that this provision speaks specifically of "property of counties, cities and towns"; but it was held in *Lower Colorado River Authority v. Chemical Bank & Trust Co.,* 144 Tex. 326, 190 S.W.2d 48 (1945), that the property of the Lower Colorado River Authority is exempt from taxation as a governmental agency. Later, in *Leander Independent School District v. Cedar Park Water Supply Corporation,* 479 S.W.2d 908 (Tex.1972), we wrote:

A reading of these two sections indicates that the framers of the Constitution contemplated: (1) that Art. XI, Sec. 9, would apply only to property owned by counties, cities and towns, and would operate to exempt the property of these political subdivisions provided it was devoted exclusively to a public use; and (2) that other property publicly owned and used for a public purpose might be exempted by the Legislature under the provisions of Art. VIII, Sec. 2. It has been held, however, that Art. XI, Sec. 9, exempts all public property used for public purposes even though not owned by a county, city or town. *Lower Colorado River Authority v. Chemical B. & T. Co.,* 144 Tex. 326, 190 S.W.2d 48.

. . . . .

. . . The holding in *Lower Colorado River Authority* will not be disturbed since it is now firmly embedded in our jurisprudence, but we do not feel compelled by the construction there given one provision of the Constitution to adopt what we regard as an erroneous interpretation of a clause in an entirely different section.

479 S.W.2d at 911, 913.

For our purposes here, however, suffice it to note that the Court in *Lower Colorado River Authority* referred with approval to *Daugherty v. Thompson,* 71 Tex. 192, 9 S.W. 99 (1888), where, it was stated, the Court "announced in unmistakable language that the legislature is without power to tax any property publicly owned and held *only* for public purposes and *devoted exclusively to the use and benefit of the public.*" (Emphasis added).

Apart, then, from the matter of reconsidering the holding in *Lower Colorado River Authority,* that the thrust of Article XI, Sec. 9 of the Constitution reaches beyond, "counties, cities and towns" to any governmental agency, it is sufficient for our purposes here that, for the reasons stated in our original opinion, the property in question is not held *only* for public purposes and is not devoted *exclusively* to the use and benefit of the public.

The Motions for Rehearing are overruled.