TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-07-00252-CV






Engelman Irrigation District, Appellant


v.


Texas Commission on Environmental Quality and Shields Brothers, Inc., Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT

NO. D-1-GN-04-003790, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING





O P I N I O N


 This appeal concerns the denial of Engelman Irrigation District's application for
authorization to proceed in federal bankruptcy. Declaring itself unable to meet its debts and other
obligations as they mature, Engelman sought bankruptcy authorization from the Texas Commission
on Environmental Quality ("Commission"). See Tex. Water Code Ann. § 49.456(a)-(d) (West 2000)
(no district may proceed in bankruptcy until authorized to do so by written order of the Commission). 
After a three-day hearing before an Administrative Law Judge ("ALJ") at the State Office of
Administrative Hearings, the Commission issued a final order denying Engelman's bankruptcy
application. Engelman sought review in district court, and the district court affirmed the order of
the Commission. Engelman now appeals. For the reasons that follow, we affirm the judgment of
the district court.



BACKGROUND

 The course of this nearly twenty-year dispute over the provision of irrigation waters
from the Lower Rio Grande, roiled by a decade-long delay in paying a final judgment, was channeled
into this Court's jurisdiction when the debtor irrigation district sought the Commission's
authorization to declare bankruptcy.

 Engelman, an irrigation district in Hidalgo County, Texas, created pursuant to article
XVI of the Texas Constitution, is a governmental agency of the State that is under the supervisory
authority of the Commission. On January 30, 1995, Shields Brothers, Inc., obtained a jury verdict
against Engelman for breach of contract as a result of Engelman's failure to deliver irrigation water
that Shields Brothers had purchased in the early 1990s. (1) The trial court awarded Shields Brothers
$397,606.07 in actual damages, pre-judgment interest, and attorney's fees and ordered that the
judgment bear interest at 10% per annum from March 22, 1995, until paid. The judgment was
affirmed on appeal and became final in December 1998. See Engelman Irrigation Dist. v. Shields
Brothers, Inc., 960 S.W.2d 343 (Tex. App.--Corpus Christi 1997), pet. denied, 989 S.W.2d 360
(Tex. 1998) (per curiam).

 Beginning in February 1999, Shields Brothers filed motions in the trial court to order
Engelman to levy, assess, or collect taxes or assessments in order to pay the judgment. At that time,
Engelman made its first "settlement and satisfaction of debt agreement" offer, proposing to pay
Shields Brothers $50,000 upon full execution of settlement documentation, proceeds from the sale
of all of its oil and gas mineral interests, and annual payments of $25,000 for seven years. Shields
Brothers refused the offer. (2) In response, Engelman declared itself unable to pay the Shields Brothers
judgment and, in March of 1999, activated the bankruptcy-authorization process provided under the
water code. See Tex. Water Code Ann. § 49.456(a)-(d); see also 30 Tex. Admin. Code § 293.88
(2005) ("bankruptcy-authorization rule"). 

 Under the water code, a district that is subject to the continuing supervision of the
Commission, such as Engelman, may not proceed in bankruptcy unless it is authorized to do so by
written order of the Commission. See Tex. Water Code Ann. § 49.456(a). When a district submits
a bankruptcy application to the Commission for approval, the Commission "shall investigate the
district's financial condition," including its assets, liabilities, and sources of revenues. Id.
§ 49.456(c). The Commission shall deny a district's application unless it determines that the district
cannot, through the full exercise of its rights and powers, reasonably expect to meet its debts and
other obligations as they mature. Id. § 49.456(d). But even if the Commission does determine that
a district cannot reasonably expect to meet its debts through the full exercise of its rights and powers,
the decision to authorize a district to proceed in bankruptcy is made at the Commission's discretion. 
See 30 Tex. Admin. Code § 293.88(c) ("If, after consideration of all evidence, the commission
determines that the district cannot . . . reasonably expect to meet its debts and other obligations as
they mature, the commission may authorize the district to proceed in bankruptcy.") (emphasis added).

 Shields Brothers opposed Engelman's application and submitted evidence to the
Commission that Engelman did in fact have the ability to pay the judgment owed to Shields
Brothers. As of May 31, 2002, the amount of the outstanding judgment with all of the accrued post-judgment interest was $789,893.52. 

 Following its investigation of Engelman's financial condition, the Commission issued
an interim order in 2002 denying the bankruptcy request and referring the matter to the State Office
of Administrative Hearings "to develop facts and any limitations in law with regard to specific
measures to generate revenues to meet the District's obligations." Engelman, Shields Brothers, and
the Commission were all parties in the SOAH proceeding.

 After conducting a hearing on the merits, the ALJ issued a proposal for decision,
recommending that the Commission find that Engelman, in order to meet its debt obligations, could: 
(1) sell some of its water rights; (2) sell all of its mineral rights; (3) sell some of its water allocations;
(4) increase its assessments to irrigators; and, with Commission approval, (5) obtain a long-term revenue note.

 On September 7, 2004, the Commission issued its final order denying Engelman's
application to proceed in bankruptcy ("Order"), concluding that Engelman can, through the full
exercise of its rights and powers, reasonably expect to meet its debt obligations. The Order largely
adopted the findings of the ALJ, identifying the same five measures that the ALJ had determined
Engelman could use to generate revenue. The Order further directed Engelman to "adopt specific
measures to generate sufficient revenue to settle the judgment against it," which "may include but
are not limited to a combination of those specified" in the Order. In determining that Engelman
could sell some of its water rights, one of the most contentious issues in this case, the Commission
made several fact findings, including: (1) Engelman has a current balance of 20,031 acre-feet of
water rights, but only 7,498 irrigable acres within its boundaries; (2) Engelman has 1,286 acre-feet
of "excess water rights"; (3) Class A water rights, the type owned by Engelman, are in high demand
and are worth at least $1,200 to $1,500 per acre-foot; (4) Engelman possesses 427.78 "excluded"
acres with irrigation water rights that it can sell to municipalities; and (5) Engelman has sold
3,064 acre-feet of its original certificated water rights. 

 Engelman sought judicial review and reversal of the Order in district court, asserting
that the Order was not supported by substantial evidence, that the Order violated Engelman's
substantial rights by forcing it to raise money by means that violated the constitution and laws of
Texas, and that the Order was arbitrary and capricious because the Commission exceeded its
authority and failed to order Engelman to adopt specific measures to raise the money to pay the
Shields Brothers debt. The district court affirmed the Order of the Commission in all respects, and
Engelman appeals. (3)


DISCUSSION

 In five issues, Engelman asserts that the district court erred in affirming the Order
because Engelman has no ability to reasonably expect to meets its debts and other obligations as they
mature, requiring the Commission to authorize Engelman's bankruptcy application as a matter of
law. Specifically, Engelman asserts that (1) the Commission had no authority to order Engelman
to sell water rights or other property in violation of the constitution and laws of Texas; (2) the
Commission wrongly concluded that Engelman could borrow money to satisfy the Shields Brothers
judgment and therefore the Commission's finding on this issue was unsupported by the evidence;
(3) there is no evidence to support the Commission's finding that Engelman can increase its water
assessments in an amount sufficient to satisfy the judgment; (4) the Commission failed to order
Engelman to adopt specific measures to raise revenue in order to satisfy the judgment, as required
by the Commission's bankruptcy-authorization rule; and (5) there is no evidence that Engelman can
reasonably meet its debt obligations as they mature.


Standards of review

 Engelman's first issue requires us to construe the forced-sale provision of the
Texas Constitution, see Tex. Const. art. XI, § 9, to determine whether the Commission has ordered
a forced sale of Engelman's assets. This is a question of law, which we review de novo. See Texas
Dep't of Transp. v. Needham, 82 S.W.3d 314, 318 (Tex. 2002). We are also asked to interpret
various sections of the water code governing the Commission's authority to review Engelman's
bankruptcy application and to require Engelman to exercise its statutory powers by adopting specific
measures to meet its debt obligations. When interpreting a statutory provision, a court must ascertain
and effectuate the legislative intent. See Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378, 383
(Tex. 2000). The construction of a statute by the administrative agency charged with its enforcement
is entitled to great weight by reviewing courts. State v. Public Util. Comm'n, 883 S.W.2d 190, 196
(Tex. 1994); Bexar Metro. Water Dist. v. Texas Comm'n on Envtl. Quality, 185 S.W.3d 546, 550
(Tex. App.--Austin 2006, pet. denied). 

 Engelman's remaining arguments challenge whether the Commission's actions in
denying its bankruptcy application were adequately supported by the evidence. We review these
determinations under a substantial-evidence standard. See Tex. Gov't Code Ann. § 2001.174
(West 2000) (allowing court to reverse agency determination if party's substantial rights have
been prejudiced because determination is not supported by substantial evidence). Under the
substantial-evidence rule, we give significant deference to the agency in its field of expertise. 
Railroad Comm'n v. Torch Operating Co., 912 S.W.2d 790, 792 (Tex. 1995). When a court is
applying the substantial-evidence standard of review, the issue is not whether the agency's decision
was correct, but whether the record demonstrates some reasonable basis for the agency's action. 
Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc., 665 S.W.2d 446, 452 (Tex. 1984);
Central Power & Light Co. v. Public Util. Comm'n, 36 S.W.3d 547, 557 (Tex. App.--Austin 2000,
pet. denied). In fact, the evidence may actually preponderate against the Commission's finding and
be upheld as long as there is enough evidence to suggest that the Commission's determination was
within the bounds of reasonableness. Cities of Abilene v. Public Util. Comm'n, 146 S.W.3d 742, 748
(Tex. App.--Austin 2004, no pet.). We evaluate the entire record to determine whether the evidence
as a whole is such that reasonable minds could have reached the conclusion the agency must have
reached in order to take the disputed action. Texas State Bd. of Dental Exam'rs v. Sizemore,
759 S.W.2d 114, 116 (Tex. 1988). Under this standard, we are prohibited from substituting our
judgment for the Commission's as to the weight of the evidence on questions committed to agency
discretion. Id. We presume that an agency's order is supported by substantial evidence, and the
complaining party has the burden of overcoming that presumption. Id.

 We also use the substantial-evidence standard to determine whether the Commission
complied with its own bankruptcy-authorization rule. An agency's interpretation of its own
regulations is entitled to deference by the courts, even though that interpretation is not binding. 
Public Util. Comm'n v. Gulf States Utils. Co., 809 S.W.2d 201, 207 (Tex. 1991); Lone Star Salt
Water Disposal Co. v. Railroad Comm'n, 800 S.W.2d 924, 929 (Tex. App.--Austin 1990, no writ). 
We will reverse the Commission when it fails to follow the clear, unambiguous language of its own
regulations such that its actions are arbitrary and capricious. Power Res. Group, Inc. v. Public Util.
Comm'n, 73 S.W.3d 354, 357 (Tex. App.--Austin 2002, pet. denied). Thus, absent evidence that
the Commission disregarded the plain language of its rules, we look to its expertise in calibrating
various policy considerations. Id.


Sale of assets

 In its first issue, Engelman asserts that the trial court erred in affirming the Order
because the Order requires Engelman to sell water rights in violation of the Texas Constitution, the
water code, judicial decision, and the Commission's own bankruptcy-authorization rule. Engelman
urges that, because the Commission lacked authority to require Engelman to sell its property in
violation of the law, the Order is arbitrary, capricious, and an abuse of discretion. Within this issue,
Engelman further alleges that the underlying judgment in favor of Shields Brothers is void as a
matter of law, that the Order's findings of fact are clearly erroneous, and that its conclusions of law
are unsupported by the evidence. 


 A. "Forced sale"

 We first address Engelman's contention that the Order requires an unconstitutional
forced sale of Engelman's assets. Article XI, section 9 provides that "all property devoted
exclusively to the use and benefit of the public shall be exempt from forced sale and from taxation." 
Tex. Const. art. XI, § 9. The parties do not dispute that article XI applies to property that Engelman
holds for public purposes; rather, they disagree as to whether the Order mandates a constitutionally
proscribed "forced sale" of Engelman's assets. Engelman declares that the water rights that the
Commission "wants Engelman to sell are derivative of the land in the district and the rights of
persons owning land to which the water is appurtenant," and that the Order "effectively forces
Engelman to choose from several equally unreasonable options for raising funds, [including] selling
water rights and other property."

 The Commission responds that the Order does not constitute a forced sale because
it "does not require Engelman to sell anything." Rather, in its findings of fact, the Order sets forth
that Engelman has the ability to sell some of its water rights, its mineral rights, and a portion of its
water allocations. In its conclusions of law, the Order cites the specific provisions of the water code
authorizing Engelman to sell these assets and, in ordering paragraph 2, states:


The District shall adopt specific measures to generate sufficient revenues to settle the
judgment against it. These measures may include but are not limited to a
combination of those specified in Conclusion Of Law Numbers 3-9 [of the Order]. (4)


 According to the Commission, Engelman retains discretion at this stage to choose the
means by which it can raise revenue, whether it elects to sell some combination of the assets
identified in the Order or to utilize other means not considered by the Commission or the ALJ,
including entering into agreements with Shields Brothers to restructure the debt.

 There is scant authority construing the forced-sale prohibition contained in article
XI, apart from a handful of cases involving liens against public building projects. (5) See, e.g.,
Atascosa County v. Angus, 18 S.W. 563, 563 (Tex. 1892) (holding that builder's lien is not
enforceable against public buildings and grounds except as expressly permitted by statute);
City of LaPorte v. Taylor, 836 S.W.2d 829, 831-32 (Tex. App.--Corpus Christi 1992, no writ)
(noting that legislature has provided limited statutory remedy supplanting materialman's lien in
construction contract for public-works project, consistent with Texas Constitution's express
exemption of public property from forced sale); see also Quincy Lee Co. v. Lodal & Bain Eng'rs,
Inc., 602 S.W.2d 262, 264 (Tex. 1980) (construction contract with entity created under article XVI,
section 59 of Texas Constitution will in no event give rise to lien). 

 It is clear from the record before us in this case, however, that the Commission has
not ordered a "forced sale" of Engelman's water rights or any other of its assets. The language of
the Order is not mandatory and does not require Engelman to sell any of its assets, but instead
provides that the district is entitled to do so under the express authority of several provisions of the
water code. See Tex. Water Code Ann. §§ 49.226(a) ("any land or interest in land owned by the
district which is found by the board to be surplus and is not needed by the district may be sold");
.2261(1) ("district may purchase, acquire, sell, transfer, lease, or otherwise exchange water or water
rights under an agreement . . . that contains terms that are considered advantageous to the district");
58.183(a)-(b) (district may sell waterpower privileges so long as sale does not interfere with district's
obligation to furnish adequate supply of water for purposes for which the district was organized);
.184 ("district may sell any surplus district water for use in irrigation or for domestic or commercial
uses to any person who owns or uses land in the vicinity of the district or to other districts which
include land in the same vicinity"). 

 Ordering paragraph 2 requires only that Engelman adopt "specific measures"--which
"may include but are not limited to" the sale of some of the assets identified--in order to generate
sufficient revenues to settle the judgment against it. This language assures us that the Commission
is not forcing a sale of Engelman's assets in violation of the constitution but is in fact allowing
Engelman the discretion to decide which of the available measures can best be employed to satisfy
its obligation. As the Commission explained during oral argument, "settling" the judgment could
be achieved in several ways, including by restructuring the debt with Shields Brothers or even by
collaterally attacking the judgment and having it be declared void and unenforceable. (6) Because the
Order allows Engelman to choose from a range of alternative means to raise revenues in order to
satisfy its debt obligations, we reject Engelman's claim that the Order is "tantamount" to a directive
requiring Engelman to sell its "non-surplus property." (7) 

 Nor are we persuaded that the Order requires a forced sale of Engelman's assets in
violation of the water code. Section 49.153, cited by Engelman for the proposition that the water
code further protects the property of irrigation districts from forced sale, concerns how the board of
a water district may borrow money on a negotiable or nonnegotiable revenue note and how such a
note is to be paid. See id. § 49.153(a)-(e). It sets forth the requirement that no obligation incurred
by a district "may ever be a charge on the property of the district or on taxes levied or collected by
the district." Id. § 49.153(b). According to Engelman, section 49.153 "underscores the protection
afforded by the Texas Constitution against forcing the sale of district property." 

 We have no doubt that the constitution contains such a protection. However, section
49.153 of the water code has no bearing on our analysis of whether Engelman is permitted to sell a
portion of its assets, including some of its water rights. While it is statutorily entitled to do so,
Engelman has not chosen to borrow money on any notes, thereby invoking application of section
49.153. In the event that Engelman elects to borrow money by issuing a negotiable note, one of the
several revenue-raising methods identified in the Order, it will have to comply with the requirements
of section 49.153. But we can find nothing in the Order concerning Engelman's option to borrow
money on a negotiable instrument if it so chooses that is inconsistent with either the water code or
article XI of the constitution. We therefore hold that the Order does not require an unconstitutional
"forced sale" of Engelman's assets.


 B. Sale of water rights

 Also within its first issue, Engelman argues that any sale of its water rights would
violate sections 49.226 and 49.2261 of the water code. Section 49.226 requires that, before any land
or interest in land owned by an irrigation district may be sold, the district's board must find it to be
a "surplus" asset. Id. § 49.226. Section 49.2261 provides that a district may "purchase, acquire, sell,
transfer, lease, or otherwise exchange water or water rights," so long as the agreement "contains
terms that are considered advantageous to the district." Id. § 49.2261. Engelman declares that the
record in the case establishes that it has no surplus water rights and that "any sale of water rights
would not be 'advantageous' to Engelman." Therefore, Engelman argues that the Order is arbitrary,
capricious, and an abuse of discretion. This challenge concerns the sufficiency of the evidence
supporting the Commission's finding that Engelman has the ability to sell some of its water rights,
based on its implied finding that the district has some surplus water rights. As discussed above, we
review this issue under a substantial-evidence standard. 

 As a related matter, Engelman asserts that it has a "continuing duty" to provide
2.5 acre-feet per irrigable acre of land to its irrigators under the case adjudicating water rights in the
Rio Grande Valley, State v. Hidalgo County Water Control & Improvement Dist. No. 18, 443 S.W.2d
728 (Tex. Civ. App.--Corpus Christi 1969, writ ref'd n.r.e.). Engelman had argued before the ALJ,
as it does now on appeal, that the evidence of Engelman's ability to sell water rights must be
considered in light of this duty to provide a minimum of 2.5 acre-feet per irrigable acre. Because
Engelman's characterization of much of the evidence relies on its assumption that the district has
such a duty, we must first address whether this was indeed the holding of the Hidalgo County case.

 Both the Commission and Shields Brothers maintain that Engelman has misconstrued
Hidalgo County by asserting that the case imposes an obligation on the district to provide a
minimum level of water to each irrigable acre within its boundaries. On the contrary, they argue,
the court of appeals determined that 2.5 acre-feet is the maximum amount of water that an irrigation
district may provide per acre, based on the unambiguous language of the opinion. Moreover, asserts
Shields Brothers, Engelman had taken a directly contrary position in the underlying litigation giving
rise to the judgment now at issue by asserting that it had no duty to provide water to the irrigators
in its district.

 Hidalgo County, commonly referred to as the Valley Water Case, was a massive
adjudication brought by the State in 1956 to determine rights to the use of the United States's share
of the waters of the Rio Grande. See Hidalgo County, 443 S.W.2d at 729; see also Texas Water
Rights Comm'n v. Crow Iron Works, 582 S.W.2d 768, 769 (Tex. 1979). The case involved
approximately 3,000 named defendants and 850,000 acres of land. The Corpus Christi Court of
Appeals exercised jurisdiction over all of these claims, affirming in part the district court's creation
of a class of "equitable" water rights holders made up of people "who have been making a good faith
use of the waters of the Rio Grande for irrigation purposes prior to the institution of this suit." (8) 
Hidalgo County, 443 S.W.2d at 749. These equitable rights, termed by the court of appeals as
"Class B" irrigation rights, were distinguished from the legal or "Class A" rights held by those who
acquired their rights "by virtue of having complied with the appropriation statutes of the State or
those whose rights have been recognized by the State." Id. at 748. "Class A" rights include those
possessed by the statutorily created water control and improvement districts, such as Engelman's
predecessor, Hidalgo County Irrigation District No. 6. 

 In upholding the district court's creation of a weighted priority system, the court of
appeals determined that there was sufficient evidence to support the trial court's finding "that the
amount of water which can be applied to beneficial use for agricultural purposes on the lands
involved in this litigation is a maximum of 2.5 acre feet per acre per annum." It is this language that
gives rise to the parties' dispute as to whether Engelman is currently under an obligation to supply
at least 2.5 acre-feet of water to each irrigable acre within its boundaries. The ALJ agreed with the
Commission and Shields Brothers that "nothing in the . . . opinion indicates that an irrigation district
has a 'legal duty' to provide 2.5 [acre-feet] per irrigable acre," citing expert testimony that such a
duty has not been recognized or enforced--either by Engelman or by any other irrigation
district--since the case was decided. (9) Nor has the Texas Supreme Court ever characterized
Hidalgo County as having created a duty to provide at least 2.5 acre-feet per acre; rather, as it
explained in Crow Iron Works, what was created was a two-tiered system wherein both classes "are
entitled to an allotment of up to 2.5 acre-feet per acre, but water is credited to Class A rights at a
70% faster rate than it is credited to Class B rights." 582 S.W.2d at 770 (emphasis added).

 We think it is clear that Hidalgo County does not speak to a "continuing legal duty"
on the part of Engelman or any other irrigation district to provide 2.5 acre-feet per acre to its
irrigators. The issue for determination in that case was whether the irrigators described as "Class B"
users had any right to the waters that they had been diverting in good faith, which the court resolved
in their favor based on principles of equity and public policy. Id. at 744-50. That the court of
appeals found the evidence sufficient for the trial court to have concluded that irrigators could divert
a "maximum of 2.5 acre feet per acre per annum" is a much more limited holding than Engelman
now suggests. The court in Hidalgo County imposed no affirmative duty on the districts, but instead
recognized that the evidence in that case supported establishing a limit beyond which water could
no longer "be applied to beneficial use for agricultural purposes." (10) Id. at 747. Having determined
that Engelman is under no judicial mandate to supply 2.5 acre-feet per annum to each irrigable acre
in its district, we now turn to the question of whether the evidence is sufficient to support the
Commission's finding that Engelman could sell "some of its water rights."

 The record establishes that in 1971, Engelman was allocated 20,031 acre-feet of Class
A water rights in the Valley Water adjudication, based on its having 8,012 irrigable acres within its
boundaries at that time. (11) There was further evidence that since 1971, Engelman has had about
427 acres excluded as "nonirrigated property" and another 80 acres redesignated for domestic use
rather than for irrigation, presently leaving Engelman only 7,498 irrigable acres within its district. 
Nonirrigated lands can be "excluded" from a district pursuant to chapter 49 of the water code if the
lands are no longer irrigable, the owners no longer wish to irrigate, or the lands have been
subdivided for residential, commercial, or other nonagricultural purposes. See Tex. Water Code
Ann. § 49.309. (12)

 Based on these figures, Diego Abrego, leader of the Commission's utility and district
oversight team, testified that Engelman has a surplus of water rights. He explained that while
Engelman has had the total number of irrigable acres within its boundaries decline since 1971, it has
had no corresponding decrease in the amount of water rights it owns. Thus, Engelman's water rights
are still based on the 8,012-acre allocation, even though the district currently has only "about
7,500 irrigable acres" within its boundaries. Abrego therefore concluded that Engelman could sell
about 500 water rights (1,250 acre-feet), a reduction of 6.24% of its total water rights, without
"impair[ing] Engelman's ability to continue providing water to meet its obligations." 
Carlos Rubinstein, the Rio Grande Watermaster, also testified that, to the extent Engelman has
irrigable land "that is less than that authorized by their Certificate of Adjudication," the district has
excess water rights. In addition, Barry E. Jones, former counsel for Engelman who testified for the
district as a water law expert, stated that Engelman currently has a "slight surplus" of water rights.

 The Commission also offered evidence that Engelman is not required to provide
irrigation water to all of the irrigable acres within its district boundaries. Abrego stated that an
irrigation district is not obligated by any law to provide water to irrigators who have not paid their
yearly assessments and that the current level of delinquent assessments owed to Engelman represents
about 500 irrigable acres. In practice, Abrego concluded, Engelman only has an obligation to
provide water to "about 7,025 irrigable acres" of the 7,498 irrigable acres within its
district boundaries.

 Abrego's testimony that Engelman's irrigable acreage has been reduced by
approximately 500 acres since 1971 was undisputed. However, Engelman did assert at the hearing
that it has a duty to make allocations to the excluded acreage Abrego referred to because of its
obligation to provide water to municipalities, in particular, to the North Alamo Water Supply
Corporation. (13) Under the water code, a municipality or water supply corporation that serves
excluded lands with potable water may ask a district to convert the excluded land's proportionate
share of irrigation-water allocation from irrigation use to municipal use. See id. §§ 49.314, 51.756. 
To do so requires the approval of the Commission. Id. In response, the Commission argued that it
had not approved Engelman's application to convert water for municipal use and, therefore,
Engelman has neither a duty nor the authority to provide water to the excluded lands
for municipal use.

 Engelman also challenged the Commission's evidence that it has surplus water as a
result of some farmers' failure to pay their yearly assessments. Andy Scott, a member of Engelman's
Board of Directors, testified that the lands owned by irrigators who were delinquent in paying their
assessments could not be considered among the district's surplusage. Scott stated that when farmers
do not pay their yearly assessments to the district, this does not "free up" water for Engelman to sell;
rather, Engelman's policy was to reallocate that water to supplement the allocations to irrigators who
had paid their yearly assessments. Scott also testified that, in practice, there has been no "surplus
of water" because of drought conditions in the Valley.

 Other witnesses also testified that there is currently a water shortage in the region and
that the Rio Grande Valley has experienced intermittent drought conditions, particularly during the
mid-1990s. Max Phillips, general manager of the neighboring Delta Lake Irrigation District, stated
that to his knowledge, there have not been sufficient levels of water for any irrigation district to
provide the maximum allocation of water to its customers. He also testified that it was not Delta
Lake's policy to take away water from the accounts of farmers who are delinquent in the payment
of their yearly assessments. Instead, the water in those accounts remains available in the event that
the delinquent assessments are paid.

 On this record, the ALJ determined that Engelman has "some excess water rights"
in the amount of 1,286 acre-feet, a figure calculated by subtracting the current number of irrigable
acres from the amount existing in Engelman's district when its rights were adjudicated in 1971 and
multiplying that acreage by 2.5 acre-feet per acre. (14) As a result, the ALJ concluded and the
Commission agreed that Engelman could sell some of its surplus water rights in accordance with
section 49.226 of the water code. 

 In light of all of the evidence in the record, we hold that it was reasonable for the
Commission to have adopted the ALJ's finding that Engelman could sell some of its water rights. 
The evidence that Engelman has a 1,286-acre-foot surplus of water rights beyond what its current
irrigable acreage entitles it to have was undisputed. Engelman's only argument in response, that it
has a duty to provide water to its excluded acreage, must fail because the Commission established
that Engelman has no such obligation unless and until the Commission approves Engelman's
application to convert water for that purpose. The Commission has not done so, and there was no
evidence presented that the Commission intends to approve the conversion. While we think that
Abrego's and Scott's testimony concerning surplusage resulting from delinquent assessments relates
more to the issue of whether water is presently available for allocation than whether Engelman has
surplus water rights, it is clear that the ALJ did not rely on this evidence in calculating the 1,286-acre-foot surplusage figure. 

 Nor is the evidence that the Lower Rio Grande Valley has experienced droughts in
recent years probative of whether Engelman has a surplus of water rights. Engelman maintains that
the "sale of water rights will only make a bad situation worse and will further reduce the amount of
water allocations to Engelman." Essentially, Engelman argues that there is no way that a sale of
water rights could ever be "advantageous," as is required under section 49.2261 of the water code,
because the "sale of water rights would destroy its ability to perform its legal obligation to deliver
irrigation water." According to Engelman, the record is "completely devoid of evidence" that it
would not be materially and adversely affected by the permanent loss of future water allocations as
the result of the sale of its water rights.

 In so arguing, Engelman misconstrues the requirement contained in section 49.2261. 
Having reviewed this issue of statutory construction under our de novo standard, we agree with the
ALJ that this provision of the water code requires only that the terms of the contract be advantageous
to the district; in other words, Engelman must receive a "fair price" for the rights its sells. (15) Section
49.2261 provides that a district may


purchase, acquire, sell, transfer, lease, or otherwise exchange water or water rights
under an agreement between the district and a person or entity that contains terms
that are considered advantageous to the district.



Id. § 49.2261(1). It is clear from the plain language of the statute that the word "advantageous"
refers only to the terms of the agreement under which a district acquires or sells water rights. This
language is not prohibitory, precluding "any sale of water rights" in the event that a district
determines that selling an asset would not be advantageous to it. Instead, the language is permissive,
granting a district the authority to buy and sell assets, provided that the terms of the exchange are
advantageous to the district. (16) The statute does not mean, as Engelman suggests, that any sale of
water rights would violate the water code because there was testimony that the Valley is
experiencing a water shortage and drought conditions. On the contrary, regardless of whether a
water shortage exists, Engelman has the capacity to enter into an agreement that contains terms that
are advantageous to it. In fact, there was evidence that because of drought conditions, Engelman
could fetch an even higher price for the sale of its Class A irrigation water rights, ensuring that a sale
of six percent of its water rights would be advantageous and profitable to the district.

 There was extensive testimony regarding the market value of Engelman's Class A
water rights, including Shields Brothers's estimation that, due to increased demand in recent years,
the value of an irrigation water right is $2,000 per acre-foot. (17) We conclude that the evidence
supports the ALJ's determination that a contract to sell some of Engelman's water rights for a price
of at least $1,200 to $1,500 per acre-foot would be "advantageous" to the district in accordance with
section 49.2261. Furthermore, contrary to Engelman's assertion, the record does contain testimony
that a reduction of 6.24% of Engelman's water rights would not materially affect the District's ability
to fulfill its statutory obligation to provide water to irrigators. This evidence demonstrates that there
was a reasonable basis for the Commission's determination that Engelman could sell some of its
water rights. Under our substantial-evidence review, we hold that the Commission did not err in
making this finding.


 C. Bankruptcy-authorization rule

 Engelman next asserts that the Commission violated its own bankruptcy-authorization
rule in denying the district's application to proceed in bankruptcy. See 30 Tex. Admin.
Code § 293.88(a)(6) (2005). According to Engelman, the Commission impermissibly found that
"Engelman should sell water rights and other non-surplus property." Engelman argues that this
finding was an abuse of discretion because the bankruptcy-authorization rule only permits the
Commission to consider revenues that are generated from a water district's imposition of taxes and
fees, not from funds generated by selling its property. Therefore, Engelman reasons, the
Commission considered an "illegal method" of raising money when it determined that the district
could sell some of its non-surplus assets.

 Section 293.88(a) lists the items that a district requesting bankruptcy authorization
from the Commission must include in its application. Id. §§ 293.88(a)(1)-(11). Along with several
other documents, a district must provide a 


complete analysis of the tax rate, user fees or other charges or sources of revenues
that the district may lawfully impose that would be necessary in order for the district
to meet its debts and obligations as they become due and the impact of such taxes and
fees upon taxpayers and users within the district.



Id. § (a)(6). According to the Commission, Engelman "ignores the fact that § 293.88 requires a
district to provide more than tax and fee information." For example, the district must also furnish
the Commission with a description of the reasons that the projections and assumptions used in
connection with the most recent issue of bonds were not realized, as well as a complete analysis of
the reasons that the district cannot reasonably expect to meet its debts and other obligations as they
mature. Id. §§ (a)(5), (7). In a final catch-all provision, the rule requires that a district must submit
"such other information" that the Commission "considers material to a determination of whether
authorization to proceed in bankruptcy should be granted." Id. § (a)(11).

 The Commission's interpretation of its own rule is entitled to deference, and we will
reverse it only when the Commission fails to follow the clear, unambiguous language of its
regulation. See Power Res. Group, Inc., 73 S.W.3d at 357. The rule at issue here, according to its
plain language, lists the categories of information that a district must supply to the Commission
when the district seeks authorization to proceed in bankruptcy. The scope of this inquiry, as the
Commission points out, is broad. Furthermore, the rule concerns the information that the
Commission should consider in order to determine whether a district can meet its debts and other
financial obligations through the full exercise of its rights and powers; it does not discuss the actual
measures that the district will have to implement if the Commission determines that the district's
application should be denied. Nothing in the rule speaks to which specific measures the Commission
may order the district to implement, and nothing prohibits the Commission from considering a
particular measure of generating revenue. We conclude that the Commission did not abuse its
discretion in determining that it could consider the revenue-generating methods that are contained
in the Order, not limited to the imposition of taxes, user fees, and other charges.

 Having determined that the Order does not violate the constitution and laws of Texas
and that the evidence supports the Commission's finding that Engelman could sell some of its water
rights, we overrule Engelman's first point of error.


Borrowing money

 In its second issue, Engelman asserts that the Commission erred in determining that
Engelman could borrow money to satisfy the Shields Brothers debt because there is no provision
allowing a district to borrow money for the purpose of satisfying a private judgment creditor. 

 Under section 58.391 of the water code, the board of an irrigation district


may declare that funds are not available to meet lawfully authorized obligations of
the district, thereby creating an existing emergency, and may borrow money at a rate
of not more than 10 percent a year on notes of the district to pay obligations.


Tex. Water Code Ann. § 58.391. The Commission points out that the plain language of the water
code thus allows Engelman, if it so chooses, to pay a lawful judgment entered against it by
borrowing money under the water code. While giving deference to the Commission's reasonable
interpretation of this provision, we further note that Engelman's interpretation would lead to the
absurd result of requiring the legislature to specifically set out every "lawfully authorized obligation"
to which a district may apply revenues generated from borrowing money. We do not think that the
water code must expressly authorize a district to borrow money to pay a private judgment creditor,
which is included within the obligations already contemplated by the statute. 

 Engelman argues, however, that even if it could legally borrow money to pay the
Shields Brothers judgment, "there is no evidence in the record" upon which the Commission could
have determined that Engelman could repay the debt because Engelman does not have the ability to
pay long-term debt. We disagree. Diego Abrego testified that sections 49.152 and 49.153 of the
water code allow a district to borrow money "for any corporate purpose" on a three-year negotiable
note without requiring the district's board to declare an emergency, and that with Commission
approval, the term may be extended beyond three years. (18) Nothing in the record contradicts this
evidence or suggests that the Commission would refuse to approve a revenue note beyond three years
if Engelman sought such approval.

 We overrule Engelman's second point of error.


Water assessments and charges

 In its third issue, Engelman argues that there is no evidence to support the
Commission's finding that Engelman can increase its water assessments and charges "by an amount
sufficient to satisfy the judgment." This argument is premised on the assumption that each "specific
measure" identified in the Order as a means by which Engelman could raise revenue must, in and
of itself, be sufficient to satisfy the entire obligation. This presupposition is wholly unsupported by
the governing statutes and rules of the Commission, and Engelman points us to no authority that
would support this contention. Engelman's interpretation is also contradictory to the language of
the Commission's bankruptcy-authorization rule, which refers to the specific "measures," not one
single measure, that the district shall implement. See 30 Tex. Admin. Code § 293.88. In addition,
we hold that the evidence is sufficient to support the Commission's determination that Engelman
could increase its water assessments and charges.

 As mentioned above, irrigators must pay a yearly assessment to the irrigation district
in order to receive water. The assessment is determined by the district's board of directors. See
Tex. Water Code Ann. § 58.301. Commission experts testified that, if an irrigator is delinquent in
paying his assessments, the district is not obligated to provide him with water.

 The record shows that in 2000, the average flat tax rate charged by all of the irrigation
districts in the Rio Grande Valley was $11.80 per acre, while Engelman charged only $9.00 per acre. 
Two of Engelman's directors, Urbano Anzaldua and Reynaldo Maldonado, testified that the flat tax
rate could be increased without significantly impacting their own operations as farmers in the
district. (19) Abrego testified for the Commission that Engelman could implement a "marginal
increase" in their assessment rates.

 The ALJ determined that Anzaldua's and Maldonado's testimony was sufficient
evidence to support a finding that increases in assessments and water charges would be an
appropriate "specific measure" that the district could adopt. In the absence of evidence to the
contrary, we agree with the ALJ and, as previously noted, we reject Engelman's position that each
separate revenue-generating measure must be capable of satisfying the entire judgment in full. 
Rather, as the ALJ and Commission reasonably determined based on the evidence in the record, an 
"increase[] in assessments such as the flat tax rate . . . is one such specific measure."

 We overrule Engelman's third point of error.


"Specific measures"

 In its fourth issue, Engelman complains that the Order is "procedurally flawed"
because it fails to comply with the Commission's bankruptcy-authorization rule, which requires the
Commission to order Engelman "to adopt specific measures" in order to generate revenues sufficient
to pay its debts as they mature. See 30 Tex. Admin. Code § 293.88(d). Instead, according to
Engelman, the Commission "only offered general suggestions and then leaves it to Engelman" to
decide which measures to adopt.

 Giving proper deference to the Commission's interpretation of its own rule, we find
no inconsistency between the mandate of section 293.88(d) and the ordering paragraphs at issue. 
The Order states that specific measures are to be adopted, identifies several specific measures that
the evidence shows Engelman can in fact utilize, and describes the supervisory role that the
Commission will assume in ensuring that the specific measures are implemented. Because the
Commission's interpretation is reasonable, we will defer to the Commission's decision to make it
Engelman's responsibility--not the Commission's--to decide which measures should be
implemented. See Public Util. Comm'n, 809 S.W.2d at 207; Lone Star Salt Water Disposal Co.,
800 S.W.2d at 929. Engelman's fourth issue is overruled.


"No evidence"

 Engelman's fifth issue, in its entirety, states: 


There was no evidence in the record upon which the [Commission] could find that
Engelman can reasonably meet its debt obligations as they mature. Engelman
incorporated herein its arguments and authorities set out in Issue Nos. 1-4 above
herein. For all of the foregoing reasons, the [Commission] erred in denying
'Engelman's Petition for Authorization to Proceed in Federal Bankruptcy.'


 Because this issue is duplicative of the issues we have previously addressed and
overruled, we also overrule Engelman's fifth issue.


 CONCLUSION


 Having found that the trial court did not err in finding that the Commission's Order
denying Engelman's application to proceed in bankruptcy is lawful and reasonably supported by
evidence, we affirm the judgment of the trial court.


 _____________________________________

 Diane Henson, Justice

Before Chief Justice Law, Justices Waldrop and Henson

Affirmed

Filed: April 10, 2008
1. Shields Brothers was a farming operation that had contracted to have Engelman deliver
irrigation water for its cotton, grain, and watermelon crops. The jury in the underlying cause heard
evidence that Engelman intentionally breached the water-delivery agreement, having made the
decision that it would "cut off" Shields Brothers's water supply, which ultimately put Shields
Brothers out of business.
2. In subsequent filings, Shields Brothers asserted that it had refused the settlement offer
because (1) the cash payments were less than 50 cents on the dollar of the value of the judgment at
the time of the offer and (2) there had been no appraisal of the mineral interests.
3. Following argument before this Court, we issued an order referring Engelman and Shields
Brothers to mediation, but we received notice on March 5, 2008, that the parties had failed to resolve
their dispute.
4. Conclusion 3 recites that the Commission has the authority pursuant to section 49.456 of
the water code to require the District to exercise its statutory powers and to adopt specific measures
to meet its debt obligations. Conclusions 4, 5, and 6 concern Engelman's authority to sell water
rights, mineral rights, and water allocations, respectively. The remaining conclusions, which are not
challenged in this issue on appeal, state that Engelman has the authority to borrow money for any
corporate purpose, to borrow money through negotiable notes, and to increase its assessments and
water charges in order to assist in meeting its debt obligations.
5. The sole case cited by Engelman in support of its contention "that property owned by
districts, like Engelman, created under Article XVI § 59 of the Texas Constitution are [sic] exempt
from forced sale and taxation" sheds little light on the issue raised in this case. See Lower Colo.
River Auth. v. Chemical Bank & Trust Co., 190 S.W.2d 48, 50 (Tex. 1945) (noting in dicta that
LCRA's enabling legislation exempted its property from forced sale). As mentioned above, there
is no dispute that Engelman's water rights and allocations may not be the subject of a forced sale
because these assets are the property of a governmental agency. See Satterlee v. Gulf Coast
Waste Disposal Auth., 576 S.W.2d 773, 779 (Tex. 1978) (holding that article XI, section 9 extends
to property held by government agencies).
6. The viability of these alternatives will be discussed further in response to Engelman's
evidentiary challenges to the Order.


 With respect to the enforceability issue, Engelman asserts in passing that the underlying
judgment is void as a matter of law because it did not waive its governmental immunity in the
original suit brought by Shields Brothers. That issue is not properly before us, nor has it been
adequately briefed to this Court. We express no opinion as to whether the Texas Supreme Court's
opinion in Tooke v. City of Mexia, 197 S.W.3d 325 (Tex. 2006), a case decided eight years after the
supreme court denied review in the underlying suit and the judgment against Engelman became final,
has in fact made the debt owed to the Shields Brothers void as a matter of law. In this case, when
Engelman approached the Commission for bankruptcy authorization, Engelman identified the
Shields Brothers judgment as its only existing debt obligation. The issues raised in this appeal are
limited to whether the Commission could reasonably have determined that Engelman can, through
the full exercise of its rights and powers, satisfy the debt that Engelman claimed to owe.
7. As evidence that the Commission "concedes" that the Order requires a sale of its non-surplus water rights, Engelman cites testimony from Diego Abrego, a representative for the
Commission, who acknowledged that Engelman would have to sell water rights in excess of
244 acre-feet "in order to satisfy the entire debt now." Engelman suggests that this statement is
conclusive evidence that the only way Engelman can satisfy the judgment owed to Shields Brothers
is by selling its water rights, making the Order a "de facto" forced sale of this asset. We disagree. 
Abrego was merely responding to the question of how many acre-feet of water would have to be sold
in order to raise sufficient revenue to pay the judgment at the present time if selling water rights was
the only method utilized. It is clear that under the Order, however, Engelman is not required to sell
water rights and that it may employ any method at its disposal--either in addition to or in lieu of
selling water rights--in order to satisfy its debts.
8. More recently, the Texas Supreme Court emphasized that the recognition of water rights
by judicial decree was possible "only on the unprecedented facts of that case," holding that
Hidalgo County "is limited to those facts, and cannot again be used as authority for the equitable
creation of water rights." In re Adjudication of Water Rights of the Brazos III Segment of the Brazos
River Basin, 746 S.W.2d 207, 210 (Tex. 1988).
9. Barry E. Jones, Engelman's own water law expert, acknowledged that the amount was a
"maximum" that an irrigation district would ever have to provide and that there has "never" been
a diversion from the Rio Grande Watermaster that would satisfy the 2.5 acre-foot per acre maximum
for all of the irrigation land in the Valley. The watermaster, Carlos Rubinstein, also testified that
there has never been a time when all of the irrigation districts met the full authorized water rights
of 2.5 acre-feet per irrigable acre. Engelman's obligations to its irrigators, according to Rubinstein,
vary based upon the amount of water that the district has in storage, "whatever that equates to on a
per-acre basis," depending on how much water Engelman is allocated by the watermaster--which
is, in turn, based upon the total amount of water available in the entire system. Rubinstein also
testified that, in the past, Engelman had sold water when it did not have 2.5 acre-feet per acre
available to distribute to its irrigators.
10. As the Corpus Christi court later recognized, although it "affirmed a trial court's judgment
that 2 1/2 acre-feet was the maximum beneficial use for water in the 'Valley Water case,'" that
decision must be read in light of the "evidence (annual rainfall, the particular type of land being used,
etc.) that supported the trial court's judgment." City of Corpus Christi v. Nueces County Water
Control & Improvement Dist. No. 3, 540 S.W.2d 357, 369 (Tex. App.--Corpus Christi 1976,
writ ref'd n.r.e.) (citations omitted).
11. Expert testimony at the hearing described an "irrigable acre" as an acre within an irrigation
district that will potentially use the water allocated to a district in accordance with the district's water
rights allocation. Each irrigable acre represents 2.5 acre-feet of water rights. Therefore, in
Engelman's case, 8,012 irrigable acres yields 20,031 acre-feet of water rights. 

 

 [2.5 acre-feet per irrigable acre x 8,012 irrigable acres = 20,031 acre-feet]
12. Property that is excluded from an irrigation district is no longer part of the district and is
not entitled to water services; in general, once a property is excluded the landowner has no further
liability to the district for future taxes, assessments, or other charges. See Tex. Water Code
Ann. § 49.312 (West 2000).
13. Engelman also argued before the ALJ that it was contractually required to provide "push
water" to municipalities during times of drought. "Push water" refers to the water that municipalities
can purchase from irrigation districts where there is a water shortage. Because the majority of the
municipalities are serviced by the same distribution canals that the irrigation districts use,
municipalities might be unable to access their water during a drought when there are insufficient
flows to move water through the system. Thus, push water becomes necessary "to charge the canal
to make sure that in the end the municipal water that is to be delivered to the city actually gets
delivered." Engelman does not renew this argument on appeal, however.
14. 20,031 acre-feet - [(2.5 acre-feet per irrigable acre) x 7,498 irrigable acres] = 1,286 acre-feet
15. The ALJ also noted that, "even during periods of water shortage," Engelman had
previously sold 3,064 acre-feet of its original certificated water rights.
16. "Advantageous" is defined as "giving an advantage; favorable." Merriam-Webster Online
Dictionary (www.m-w.com/dictionary/advantageous) (last visited Mar. 21, 2008). 
17. Jesus Flores, a member of Engelman's Board of Directors, agreed that Engelman's water
rights could be worth as much as $2,000 per acre-foot.
18. "The district may issue bonds, notes, or other obligations to borrow money for any
corporate purpose or combination of corporate purposes only in compliance with the methods and
procedures provided by this chapter or by other applicable law." Tex. Water Code Ann. § 49.152
(West 2005). A district may not execute a note for a term longer than three years unless the
Commission issues an order approving the note. Id. § 49.153(c).
19. Members of an irrigation district's board of directors are commonly property owners and
irrigators themselves, according to the testimony before the ALJ.